No. 6.—EDWARD B. YOUNG, plaintiff in error, vs. KENNETH McKENZIE, JAMES HARRISON and SAMUEL HARRISON, defendants in error.

[1.] The right of *eminent domain*, or inherent sovereign power, gives to the legislature the control of private property for the use of the public ; provided just compensation be made the citizen therefor ; and all grantees of land from the State, and their assigns, hold the same under this tacit agreement or implied understanding.

[2.] An act of the legislature incorporating the Irwinton Bridge Company, for the purpose of erecting a Bridge across the Chattahoochee River, which authorized the company to take the private property of the citizen, for the purpose of erecting the Eastern abutment of this Bridge, providing just compensation to be made therefor ; is not a *violation o f* the 10th section of the first article of the Constitution of the United States, which prohibits the States from passing any law impairing the obligation of contracts.

[3.] Statutes enacted in favour of corporations or particular persons, and in derogation of common right, are to be strictly construed.

[4.] The 5th article of the amendments of the Constitution of the United States, which declares that "Private property shall not be taken for public use, without just compensation," does not create any new principle of restriction on either the National or State governments which did not exist before, but was *declaratory* of a great common law principle applicable to all republican governments, which existed *anterior* to the adoption of the Constitution of the United States.

In Equity. Bill and Answer, and application for injunction. In Randolph Superior Court. April Term, 1847. Before Judge WARREN. The injunction was refused, and the complainant excepted.

The following are the facts of the case :

In the year 1837, the legislature of Georgia passed an act incorporating "The Irwinton Bridge Company," for the purpose of erecting a bridge across the Chatahoochee River, opposite the town of Irwinton, in the State of Alabama, commencing on the land belonging to the heirs of William Oliver, late of the County of Randolph. The act gave the company corporate powers, and authorized them to receive and hold the land *by donation or purchase;* but, in case of *disagreement* about the price, the company was to appoint *one* appraiser, the owner of the land another, and the Inferior Court of Randolph a third ; but in case the said owners refused to appoint the appraiser provided for, then the company was to appoint *one* and the Inferior Court *two* appraisers, who, after being sworn, were to appraise and fix the value of land sufficient for the location of the bridge ; their award to be in writing, and to be recorded, with a plot of the land awarded, in the clerk's

office of the Superior Court, as deeds are.   The act further pro-
vided, that when this was done, the money paid, or tendered and
refused, the fee-simple title of the land should be vested in the
company.   *The Act limited no time for the making and recording
the award or appointing the appraisers.*   The bill set forth that the
defendant, McKenzie, was the drawer of the land, but William
Oliver had, before the passage of the act, purchased one half, and
James Harrison the other ;  that Oliver had died before McKenzie
made the title, and  that after Oliver's death, but  before the incor-
porating act, McKenzie had made a  title to  James  Harrison
and Samuel Harrison, reciting, that one moiety was to Samuel
Harrison,  administrator of Oliver, for  the  use of the heirs of Oli-
ver.    That, since 1835, the defendants had  been, and  still were,
in possession of all the land, except that part occupied by the
location of the bridge ; and that on the same tract of land they had
an  unincorporated  ferry, which  however  was  at  some  distance
from the bridge.   The bill then  charged, that  the  company had
made every effort to induce the  defendants,  voluntarily and for  a
fair  compensation, to  part with the  land for  the  location of the
bridge, but without success;  that the company had then appointed
an appraiser, and the defendants having refused to appoint another,
the  company had  applied  to  the Inferior  Court  of  Randolph
County, which had appointed the  other  two ;  that the appraisers,
after being sworn, had made the appraisement (fixing the value of
the  land at $500) in writing, with a plot of the land ;  but that, by
mistake of  the  clerk, all  the  proceedings  were so  recorded, as to
appear  by  the  record  to  have  been  before the  *Inferior   Court
sitting as a Court of Ordinary.*   The bill charged that the company
had tendered to the Harrisons the $500 awarded, who had refused
to  receive  it ;  that  the  company, at  a  great  expense, had  pro-
ceeded  under the impression that they had pursued the provisions
of  the incorporating law, and  built the  bridge ;  but that they had
become insolvent, and  that  the  complainant,  Edward B. Young,
had purchased  the  bridge, and  had the title to the same ;  that the
bridge had fallen  down, and  that the complainant was desirous
of rebuilding it ;  and that the bridge was of *great public conve-
nience.*

The bill then charged that the defendants had brought their
action of ejectment to April Term, 1845, of Randolph Superior
Court, for  the  recovery of the land on which the bridge was
located, and for the *mesne profits*, claiming as said mesne profits the

tolls collected on the bridge by the complainant; that the defendants, at the first trial had obtained a judgment for the land and a large sum as *mesne profits;* that complainant had appealed to a special jury. The bill charged that, in consequence of the informality of the appraisement, and because it appeared to have been had under the direction of the *Inferior Court for Ordinary purposes,* and not, as the act required, before the *Inferior Court,* (which the bill charged to be merely a clerical error) the complainant had been, and would be, unable to make any use in a court of law of the said appraisement, and that he would be greatly damaged thereby. The bill then prayed that the action of ejectment might be enjoined, the defendants compelled to accept the amount awarded, and the complainant's title perfected.. The Court below sanctioned the bill, and ordered the defendants to show cause on the second day of the return term, (April, 1847,) why the injunction should not be granted. The defendants answered, admitting the facts substantially, but contending that the bridge was not of public utility, and that Samuel Harrison being only administrator, could not sell the land or appoint the appraiser. The Court below refused the injunction, and the complainant filed his bill of exceptions and assigned the refusal for error.

HINES HOLT, for the Plaintiff in error.

The complainant and plaintiff in error, assigns as error, the refusal of the Court below to grant the injunction prayed for by his bill; and in support of the general assignment assumes the following positions :

1st. The Court, by its order in chambers, required the defendants to show cause against granting the injunction.

The defendants, as containing sufficient cause, submitted their answer to the bill.

The plaintiff in error insists that said answers, to be available against the granting of said injunction, should be as full,and as fully avoid all the equity of the bill, as though the same had been filed to dissolve the injunction, had the same been granted.

The propositions in equity practice, that if a defendant submits to answer, he must answer fully; and that to dissolve an injunction, the answer must not only be fully responsive to, but avoid all the equity of the bill, are too well established to need argument or authority to sustain them.

In this case the answers are neither responsive to the allegations in the bill, nor do they swear off its equity.

2d. That the Act of 26th December, 1837, incorporating the Irwinton Bridge Company is constitutional.

First. Said act provides just compensation, and the mode of obtaining it, to the owners of the land upon which the bridge was to be, and is located.

Second. Private property may be taken for public use upon just compensation.

Third. Toll bridges, especially over navigable streams, like rail roads, turnpikes, and all like works of internal improvement, though constructed by private corporations, are for public use.

Fourth. The actual payment of such compensation is not a *condition precedent* to the taking of private property for public use; it is sufficient if the mode of obtaining such compensation be provided. Indeed, without such provision, the act would not be unconstitutional unless it had inhibited it.

3d. That if the assessment and payment of compensation was, in the case before the Court, *a condition precedent* to entering upon, and using the land for the bridge, the Irwinton Bridge Company substantially complied with said condition, and that, in so far as they failed, it was induced by the conduct of the defendants rather than the intention of the company.

The company did all in their power to comply, and this is all that equity demands in the performance of any duty. It is upon this principle that courts of equity so often decree specific performance of contracts, in the absence of strictly legal compliance with their terms.

4th. Said action of ejectment ought to be enjoined:

First. Because at law and in the action of ejectment, the legal title must prevail; and the defendants ought not to be permitted to recover the land upon which the bridge is built, and with it the structure and rents for its use; they having stood by and permitted, if not encouraged, the erection of the bridge, knowing that the Irwinton Bridge Company were proceeding under their charter; and upon the presumption that through and by virtue of it, they had acquired all the right and title which they were exercising. Admitting the conflict of decisions upon such acts of incorporation, and the even doubtful right and title of the complainant, under such circumstances, arguments *ab inconvenienti,* are not only legitimate but forcible. Let the plaintiff in this action of ejectment

but recover, and a fell blow is given to all rail-road and other enterprises, in which private property, has of necessity to be used. In a country situated as is ours, rail-roads, of necessity, must and do pass over a large number of lots of land totally valueless, the owners of which are not known and cannot be found. Let but such a precedent be established, let it be understood that the legal title carries with it the ownership of the road, as well as the right to a *pro rata* share of the tolls and freights for its use, instead of *just compensation* for the soil without the improvement, and such legal title will be at once asserted, and detached parcels of these great works of public utility and convenience, be found in the hands of individuals, with power to erect toll gates at the end of every half mile ; indeed, consistent with whose title would be the entire destruction of the work. Under such circumstances, he who would invest his means in such enterprises, would merit and receive the epithet of fool, and the Inferior Court of the County of the State of Georgia in which he might be found, fall short of its duty if it did not appoint him a guardian, and the guardian of his duty, if he did not proceed to avoid the contract on the plea of lunacy.

Second. Because the Irwinton Bridge Company, having acted under the authority of law, are not liable as trespassers: and the action of ejectment is an action of trespass.

Third. Because, the defendants are entitled only to compensation for the three acres of river sand bank upon which the bridge rests, independent of the structure thereon; upon the payment of which, the fee, will vest in the company. At law the complainant has no means of tendering or compelling the acceptance of such compensation, and cannot have, what would be in effect, and to which he is in equity entitled, a specific performance of his contract—the charter being a contract.

Fourth. Because the defendants have sued for the same cause of action and obtained a decree in equity.

And generally, said action of ejectment ought to be enjoined, because, under all the circumstances and features of the case, as made by the bill and answers, the remedy of the complainant at law is wholly incomplete and inadequate.

Authorities cited :—2 *Mad. Ch. Pr.* 339, *and cases there cited* ; *id.* 342, *et seq.*; *Eden on Injunctions,* 86 ; 1 *Kelly R.* 9 ; 1 *John. Ch. R.* 211 ; 4 *Wend. R.* 647 ; 14 *id.* 51; 9 *John. R.* 568, 573, *et seq.*; 20 *id.* 103, 735; 5 *John. Ch. R.* 101; 2 *id.*

162, 168, et seq.; 7 id. 315; Rice R. 383; 2 Porter R. 296; 2 Stewart R. 199; 6 Pick. 376; 7 id. 344; 11 Pet. R. 42; Charles River Bridge vs. Warren Bridge, 1 Pick. 417; 3 Paige R. 45; 4 id. 510; Mayor and Council of Columbus vs. Rodgers, et al., Supreme Court of Alabama, June Term, 1846, (not published); 1 Story Eq. Juris. sec. 27, 28, 32, 33, 59, 64, 65, 67, 71, 73, 74, 78, 109, 120; id. 94, et seq. id. sec. 388; 2Story Eq. Juris. sec. 885, 889; Eden on Injunctions, 112, 113; 18 Ves. Jr. 514; 19 Ves. Jr. 143; 2 Wils. R. 313; 1 Kelly R. 533.

JONES, BENNING and JONES, for the defendants in error, made the following points and cited the following authorities:

1st. The injunction ought to have been refused, because there was no equity in the bill. There was no equity in the bill, because the act incorporating the Irwinton Bridge Company, (Acts of 1837, p. 139,) on which the bill was founded, as unconstitutional and void: for that—

First. It would have impaired the obligation of the contract (grant) between the State and the defendants, or their feoffor. Acts of 1837, p. 139; Fletcher & Peck, 6 Cranch, 87, 90, 91; 1 Kent Com. 414; Dart. College, vs. Woodward, 4 Wheat.; 1 Kent Com. 419, 420; Ogden vs. Saunders, 12 Wheat. 213; 1 Howard, 311; 2 id. 608; 3 id. 711.

And this, notwithstanding the provision in the constitution, " Nor shall private property be taken for public use without just compensation :" because,

Second. The "taking," under that act, would have been, not "for public" but for private "use," for the Bridge Company was a private corporation.—11 Peters, 543, 544; Dartmouth College vs. Woodward, supra; and what was taken, was taken for its use.— The Act supra.

Third. And the "compensation" therein provided would not have been "just." Vanhorne's Lessee vs. Dorrance; 2 Dallas, 304.

Fourth. Besides, this provision does not not apply to State action.—7 Peters, 243.

2d. And because, if there was equity in the bill, it had been sworn off in the answer, by its denial, amongst other things, of the performance by the Bridge Company of certain conditions to be performed, before any right could vest in them under the act itself, (1 Kelly 526, Carr vs. Georgia Rail-road,) namely:

First. That they should try to get the land for the bridge from the "owner" by agreement, and should fail to get it.

Second. That then they should notify the "owner" to appoint "a disinterested freeholder" as an appraiser, and if he failed to do so,

Third. That then they should notify him of their intended application to the "Justices of the Inferior Court of Randolph County" for the appointment of two disinterested appraisers;

Fourth. That, on such application, the "Inferior Court" should appoint two appraisers.

Fifth. That the appraisers should act and return their proceedings to the "Inferior Court."

Sixth. That the valuation returned should be paid, or the money be tendered and refused.

And 3dly. By its (the answer's) discovery of the state of the title of the defendants, *to wit,* only a bond for title *to Oliver,* the intestate of Samuel Harrison, and only a verbal promise of title from Oliver to James Harrison, which promise was then in litigation in chancery, and of the offers of defendant, both first and last, to do what was just and equitable.

*N. B.* It is assumed that the whole of the complainant's allegations in relation to the levy of the *fi. fa.,* in favour of the *Defendants in Error* vs. *the Irwinton Bridge Company,* and to the claim by Young, are excluded from consideration upon this writ of error, as that levy, it appears, was dismissed with Young's *consent,* before the refusal of the injunction by Judge Warren.

*By the Court.*—WARNER J. delivering the opinion.

It appears from the record in this case, that the complainant, who is the assignee of the Irwinton Bridge Company, made application to the Court below, for an injunction to restrain the defendants from prosecuting an action of ejectment, for the recovery of the land on which the eastern abutment of the Irwinton Bridge is located. After hearing argument, the Court below refused the application for injunction, which refusal, the complainant assigns for error in this court.

The complainant's equity is predicated on the act of the legislature heretofore recited, the first section of which incorporates certain individuals, their successors and assigns, as a body politic,

by the name and style of the Irwinton Bridge Company, for the purpose of erecting a bridge across the Chattahoochee River, opposite the town of Irwinton, in the state of Alabama, commencing upon the lands belonging to the heirs of William Oliver, late of Randolph County, deceased.

It is also alleged by the complainant, that the company, whose assignee he is, procured the appointment of appraisers by the Inferior Court of Randolph County, to assess the damages, or value of the land taken for the eastern abutment of the bridge, as provided by the 6th section of the act, and that the appraisers so appointed, assessed the damages at $500, which sum had been tendered the defendants by the company, and was refused.

The order for the appointment of appraisers to assess the damages, was attached to the complainant's bill as an exhibit, by which it appeared, the order was made by the Inferior Court of Randolph County, when sitting for Ordinary purposes, and not by the Inferior Court, as required by the Act of Incorporation; that the same was rejected by the Superior Court, on the trial of the ejectment cause, when offered in evidence as a part of his title to the premises in dispute; that the company had attempted to comply with the provisions of the act in *good faith*, so as to vest the title in them to the premises in controversy; but owing to the defect in the record, he was unable to make out his title under the charter in a court of law, and prays that the defendants may be restrained from prosecuting their said action of ejectment for the recovery of the land and bridge erected thereon, and be decreed to accept compensation for the land, as provided by the terms of the act; and that the complainant, as the assignee of the company, may have and enjoy, the rights and privileges conferred by the act of incorporation upon them.

[1.]. The first objection raised by the defendant in error, is, that the act of the legislature incorporating the Irwinton Bridge Company, is *unconstitutional ;*—that the State, once having granted the land to one of her citizens, cannot again resume the use or disposition of it, without impairing the obligation of the contract.

Had the legislature declared the grant from the State or the title derived under it void, the obligation of the contract would manifestly have been impaired, and clearly within the prohibition of the 10th section of the 1st article of the Constitution of the United States; but the title of the defendants is not attempted to be divested on that ground.

Young vs. M'Kenzie, Harrison and others.

It was no part of the contract between the State and its grantee, or those claiming title under such grantee, that the land granted should not be taken for *public use,* whenever the interest of the *public* required it should be so taken. The rights of private property must be made subservient to the public interest and welfare. The right of *eminent domain,* or °inherent sovereign power, gives to the legislature the control of private property, for public uses; provided, just compensation be made to the citizen therefor. The interest of the public is considered paramount to that of any private individual; and all grantees of lands from the State, as well as their assignees, hold the same under this tacit agreement or implied understanding. The legislature must determine, in its wisdom and discretion, whether the benefit to the public will be of sufficient importance to render it proper for them to exercise the right of *eminent domain,* and to authorize an interference with the private rights of individuals, for that purpose; 2 *Kent Com.* 338, 339, 340; *Beekman* vs. *the Saratoga and Schenectady Rail Road Co.* 3 *Paige Ch. R.* 45; *Bloodgood* vs. *the Mohawk and Hudson Rail Road Co.* 18 *Wend. R.* 9; *the Louisville, Cincinnati and Charleston Rail Road Co.* vs. *Chapell, Rice R.* 383; *Dyer* vs. *the Tuscaloosa Bridge Co.* 2 *Porter R.* 296.

The legislature, as we are bound to believe from the en- [2] actment of the law incorporating the Irwinton Bridge Company, determined, in the exercise of their wisdom and discretion, that it was for the *interest of the public,* that a bridge should be erected across the Chattahoochee River, commencing on the lands now owned by the defendants; and therefore, expressly conferred upon the company certain rights and privileges, to enable them to construct such bridge; one of which was, to take so much land "as they might deem necessary for the construction, convenience, and protection of said bridge, and its abutments, piers, pillars, or any thing in any wise belonging to, or necessarily connected with, the construction and protection of the said bridge." In case of disagreement between the owner of the land and the company, the act provided for the appointment of appraisers, to assess the damages or value of the land so authorized to be taken; and when the value of the land should be so assessed, and payment therefor made, or the money tendered and refused, the right to the land should be vested in the company. The act also provides, that if either party shall think proper, they may appeal from the decision of the ap-

praisers, to the Superior Court of Randolph County, and have the damages ascertained by the verdict of a special jury.

This act of the legislature does nothing more than take the land of the defendants for the use of the bridge, which they have determined is for the *benefit of the public;* providing, that just compensation should be made to the defendants therefor by the *verdict of a jury,* if they should think proper to have the damages so assessed; and is, in our judgment, for the reasons already stated, a *constitutional* act.

[3.] The next question presented by the record in this case is, what are the rights of the respective parties, under this act of incorporation ? It appears the bridge has been built, and the eastern abutment thereof located on the land of the defendants; that a portion of the bridge has fallen down, that the company is insolvent, and that the complainant has become the purchaser and assignee of all the interest and rights of the company, and is desirous to rebuild the bridge; that the defendants have instituted their action of ejectment to recover the land, and the bridge located thereon. Has the complainant, or the company through whom he derives his title, complied with the requisitions of the charter, so as to divest the defendants of their title to the land, and vest the same in the company ? We think not, and the fact, that he is now applying to a court of chancery for assistance, is a virtual acknowledgment that he has not done so; for if the requisitions of the charter had been complied with, he could have successfully defended himself in the common law court, against the defendant's action of ejectment. The complainant alleges, that the company applied to the Inferior Court for the appointment of appraisers, who were appointed, and the damages assessed and tendered; but the record clearly shows, that the appointment of the appraisers was made by the Inferior Court sitting as a Court of Ordinary, and not by the Inferior Court, as the act prescribes. It is true, the same individuals are the officers of both courts; but the *jurisdiction* of the two courts, is not the same. The Court of Ordinary, under the charter, had no authority to appoint appraisers to assess the damages. And, although it appears, that the damages assessed were tendered to the defendants, yet, it does not appear, that the company or the complainant, have the money *now ready* to pay them; which is a very important requisite when the title is sought to be divested; especially when it is alleged, that the company, which made the tender, is *insolvent.* In the case of *Doe ex. dem. Carr* vs. *The Georgia*

*Rail-road and Banking Company,* 1 *Kelly,* 524, we held, "In the construction of statutes made in favour of corporations or particular persons, and in derogation of common right, care should be taken not to extend them beyond their express words, or their clear import." "And while we feel bound to protect all the *vested* rights which have been legitimately acquired by all chartered companies, in the most sacred manner, yet, we feel bound to guard with great care and vigilance, the rights of the citizen against all unauthorized encroachments on their part, by confining them strictly within the limits of their respective charters." That the complainant, under the peculiar statement of facts presented by the record in this case, has an equitable right to the enjoyment of all the privileges and immunities conferred upon the Irwinton Bridge Company by the Act of Incorporation, on strict compliance with the terms and provisions of that act, is readily admitted; and our judgment will be so regulated as to secure them to him.

The next question for our consideration, is, what are the [4.] rights of the defendants, as presented by the record before us?

The Irwinton Bridge Company, under the authority of the legislature, seek to appropriate private property for the benefit of the public, in the erection of a bridge across the Chattahoochee River. The existence of this public necessity to take the private property of the defendants for that purpose, has already been determined by the legislature; and the terms on which their private property is to be appropriated for the use of the public, clearly defined in the act.

By the 5th article of the amended Constitution of the United States, it is declared, "Private property shall not be taken for public use, without just compensation." But it is said, this amendment of the constitution, does not apply to the States—that it is a restriction on the Federal Government alone—that there is no such restriction in the Constitution of the State of Georgia. Does the amended Constitution of the United States, by declaring "Private property shall not be taken for public use without just compensation," introduce, or create, a *new principle of restriction,* which did not exist before? Did not the same principle of restriction exist, both as it regards the Federal and State Governments, before the adoption of the amendment in question? Does the amended constitution do any thing more than declare a great common law principle, applicable to all governments, both State and Federal, which has existed from the time of *Magna Charta,* to the

present moment?    The amended constitution of the Union asserts a great principle, applicable, it is said,  to the *National Government.* Why  is not the same  great  principle  equally  applicable  to the *State Government?*    Can any solid reason be given, why the State legislature  should  take private property  for  public use  without just  compensation, when the national legislature cannot?

It will be  seen  upon examination, this great  principle was  not only recognised by the *civil jurists,* but was  distinctly asserted, as a part of  the  common  law,  long  *anterior* to its adoption into the amended constitution of the United States.   In the  29th  chapter of *Magna Charta,* we find this declaration, "No  freeman  shall be taken, or imprisoned,  or be disseised of his freehold,  or liberties, or otherwise  destroyed, but  by lawful judgment of his  peers, or by the law of the land."

The  State of South  Carolina has  substantially  adopted  this clause of *Magna Charta* into her  State Constitution.   The 2d section of the 9th article of the State  Constitution of South Carolina  declares,  "No freeman of this State  shall be taken,  or imprisoned,  or disseised  of his  freehold, liberties,  or privileges,  or outlawed, or exiled, or  in any manner destroyed,  or deprived  of his life, liberty or property,  but by the  judgment of his peers,  or by the law of  the land."   The people of South Carolina substantially  asserted  the  principles  declared by  *Magna Charta,* as did the people of the several  States, when they  ratified  the amendments to the Federal Constitution, and declared "*private property shall not be  taken for public use  without just compensation.*"   The declaration is made in language somewhat different, *more  explicit,* but the principle for all *practical* purposes, is the same.

Sir William  Blackstone in his Commentaries,  speaking  of the rights of property,  after  repeating  the  provisions  of the *great charter,* continues "So great  moreover,  is the  regard of the law for private property,  that it will not  authorize the  least  violation of it; no, not even for the general good of  the  whole community. If a new road, for  instance, were to be made through the grounds of a private person, it might perhaps,  be  extensively beneficial to the public;  but the law permits no  man, or set of men, to do this without consent of the  owner  of the land.   In  vain  may  it  be urged that the good of the individual ought to yield to that of  the community; for it would be dangerous  to allow  any private man, or even any public tribunal, to be the  judge of  this common good, and to  decide whether  it be  expedient or no.   Besides the pub-

lic good is in nothing more essentially interested, than in the protection of every individual's private rights, as modelled by the municipal·law.   In this and similar cases, the legislature alone can, and indeed frequently does, interpose, and compel the individual to acquiesce.   But how does it interpose and compel ? Not by absolutely stripping the subject of his property in an arbitrary manner, but by giving a *full indemnification, and equivalent for the injury thereby sustained.*   The public is now considered as an individual, treating with an individual, for an exchange.   All that the legislature does, is to oblige the owner to alienate his possessions for a *reasonable price,* and even this is an exertion of power which the legislature indulges with caution, and which nothing but the legislature can perform." 1 *Black. C.* 139, 140.

Here then, we find this great common law principle distinctly asserted, that private property is not to be taken for the use of the public without just compensation, long anterior to the amended constitution.   Chancellor Kent in the 2d volume of his Commentaries 339, says " A provision for compensation is a necessary attendant on the due and constitutional exercise of the power of the law-giver, to deprive an individual of his property, without his consent; and this principle in American Constitutional Jurisprudence, is founded in *natural equity,* and is laid down by jurists, as an *acknowledged principle of universal law."*

Judge Story, commenting on the 5th article (amendments) of the Constitution of the United States, that private property shall not be taken for public use without just compensation, says, " this is an *affirmance* of a great doctrine, *established by the common law for the protection of private property.*   It is founded in natural equity, and is laid down by jurists as a principle of universal law." 3 *Story's Com.* 661. *In Bradshaw* vs. *Rogers,* 20 *John. R.* 106, Chief Justice Spencer, speaking of the 5th article of the amended Constitution of the United States, which prohibits the taking of private property for public use without just compensation, says—" It is *declaratory* of a great . and fundamental principle of government, and any law violating that principle, must be a nullity, as it ·is against natural right and justice." In the *Louisville, Cincinnati and Charleston Rail Road Co.* vs. *Chappell,* Mr. Justice Richardson, speaking of the 5th article of the amendments to the Constitution of the United States, which prohibits the taking private property for public use without just compensation, says—" It is a *plain recognition of the principle* asserted

by all writers upon the fundamental law of national societies, and it may now be taken as a principle, expressed or implied, in every one of our State Constitutions." *Rice R.* 387. We have thus endeavoured to show, by reference to *Magna Charta,* the learned commentaries of *Blackstone* on the common law, and the opinions of the distinguished jurists and eminent judges of our own country, that the amended Constitution of the United States, which declares "private property shall not be taken for public use without just compensation," does not create or declare any *new principle of restriction,* either upon the legislation of the National or State governments, but simply recognised the existence of a great common law principle, founded in natural justice, especially applicable to all republican governments, and which derived no additional force, as a *principle,* from being incorporated into the Constitution of the United States. But it may be asked, if this principle of restriction existed *before* the adoption of the amendments to the Constitution, why were the amendments proposed and adopted? The preamble to the resolution of Congress, proposing the several amendments to the State legislatures, gives the answer. The preamble states, "The convention of a number of States having, at the time of their adopting the Constitution expressed a desire, in order to prevent misconstruction or abuse of its powers, that further *declaratory* and restrictive clauses should be added; and, as extending the ground of public confidence in the government will best insure the beneficent ends of its institution." *Marbury & Crawford Dig.* 660. It is admitted that some of the amendments create new restrictions upon the general government, and are applicable to Congress alone, while others are *declaratory* of great fundamental principles, then existing and recognised. The amendments were proposed and adopted, because a number of the States had expressed a desire, to prevent misconstruction or abuse, that further *declaratory* and *restrictive* clauses should be added. The clauses to be added were not all *declaratory* nor were they all *restrictive ;* but some of the clauses to be added were *restrictive,* and some *declaratory ;* of which latter class is the clause which declares, " *private property shall not be taken for public use, without just compensation.*

Does this great fundamental principle, founded on natural equity established by the common law for the protection of private property, lose any of its force when applied to the legislation of our State Government, because it is asserted and declared in the

Constitution of the United States? We think not, and in the absence of any similar declaration in our State Constitution, we refer to it, as a plain, simple declaration, of a great constitutional principle of universal application, recognised and declared by the distinguished statesmen and learned civilians of our own country. When we say, an act of the legislature which takes the private property of the citizen for the use of the public, without making him just compensation therefor, is *unconstitutional* and void, as being in violation of the Constitution of the United States, we only say, it is a violation of the fundamental law of the land, as *asserted or declared by the Constitution of the United States.* Most of the States have embodied this great fundamental principle in their State Constitutions; but the State of Georgia has not: and hence it is that we usually refer to the Constitution of the United States, where it is plainly and explicitly declared, when we desire to make a *practical* application of the principle to the legislation of the State.

It is admitted that the Irwinton Bridge Company have taken the *private property* of the defendants, for the erection of the eastern abutment of their bridge. Have they made them *just compensation* therefor as required by the Constitution? We think not, and before they can be deprived of their land, for the *permanent use* of the bridge, this must be done. We do not intend to say, that the company could not have entered on the land, made the necessary survey and examination of the premises, under the authority of the legislature, for the purpose of locating the eastern abutment of the bridge; but we do intend to say, the company had no authority to appropriate the private property of the defendants for the *permanent and exclusive use* of the company, until just compensation had first been made therefor in the manner pointed out by the charter. The landholder stands upon all his rights, and may enforce them by all legal remedies, until he is divested of his title for the use of the public in the manner prescribed by the Act of Incorporation.

The bill alleges that the company, in *good faith,* attempted to comply with the terms of the charter, and thought they had done so, and proceeded to erect the bridge; but owing to the *mistake* of the clerk, the application for the appointment of appraisers was entered on the record book of the clerk of the Court of Ordinary; and that it would be unjust now to permit the defendants to recover, in their action of ejectment, the bridge so

erected by the company, under a *mistaken apprehension of their rights under the charter.*

Under the peculiar circumstances of this case, as shown by the record, we are of the opinion, that the complainant is equitably entitled to have the action of ejectment enjoined, until he shall have a *reasonable* time allowed him to comply with the terms of the charter, and that the injunction be then dissolved, reserving to the defendants the right to prosecute their action of ejectment, for the recovery of the *mesne profits only* of their land, from the time the same was used and occupied by the company and their assignee, up to the time the title of the complainant shall be perfected.

This cause came on to be heard on the transcript of the record from the Superior Court of Randolph County, and was argued by counsel.

Whereupon it is considered and adjudged by the Court, ˙that the judgment of the Court below refusing the injunction be reversed; and that the same be granted, and allowed to operate, in conformity to the opinion of this Court herein expressed.

It is the opinion of this Court, that the complainant is entitled to have the action of ejectment in the record mentioned, enjoined, so as to give the complainant a *reasonable* time to comply with the provisions of the charter incorporating the Irwinton Bridge Company, in acquiring the title to the use and enjoyment of the land on which the eastern abutment of the Irwinton Bridge is located. When such compliance is made, then said injunction to be dissolved, reserving to the defendants in the equity cause the right to prosecute their action of ejectment for the recovery of the *mesne profits only* of their land, used, enjoyed and occupied by the Irwinton Bridge Company, from the time of such user and occupation by said company, or their assignee, up to the time the title of said company, or the assignee thereof, shall be perfected, as required by the said act of incorporation.

Judgment reversed.