## STATE OF GEORGIA *v.* CENTRAL OF GEORGIA RAILWAY COMPANY *et al.*

1. The competition the defeating or lessening of which par. 4, sec. 2, art. 4 of the constitution (Civil Code, § 5800), so far as applicable to railroad companies, was designed to prevent, was competition between lines of railroad viewed with reference to their general business in and through the territory traversed by them, and not competition which might incidentally exist at mere points or particular places. A combination of railroad lines, whatever the form adopted for bringing it about, is not violative of this paragraph of the constitution, even though it might lessen or defeat competition at some point or points, if, as a general result of the combination, the public at large, as distinguished from the people of special or particular communities, was in consequence benefited.

2. Whether or not the combination of any two given lines of railroad would be contrary to this paragraph of the constitution is a question which can not be settled under any rule of universal application, but one which must be determined in each case upon its own peculiar facts and circumstances.

3. The present record discloses that there was ample evidence to uphold an adjudication that the consolidation of the two lines of railroad involved did not defeat, and was not intended to defeat, competition in the sense in which that word is used in the above-mentioned paragraph of the constitution, and also that such consolidation neither encouraged nor tended to encourage monopoly.

Argued December 4, 5, 1899. — Decided January 31, 1900.

Petition for injunction. Before Judge Hart. Putnam county. September 18, 1899.

*J. M. Terrell*, attorney-general, *Joseph S. Turner*, *S. T. Wingfield*, and *W. H. Burwell*, for plaintiff: Paragraph 4, section 2, article 4 of the constitution (Civil Code, § 5800) makes the common law, so far as relates to the purchase of one corporation by another corporation, a part of the constitution: Small's Debates of the Convention of 1877. As to what is the common law: 40 *Ga.* 583. The purchase of the Eatonton Branch Railroad by the Middle Georgia & Atlantic Ry. Co. was illegal and void. While, under the charter, the Eatonton Branch might buy or sell, no such authority belonged to the M. G. & A.: 69 Texas, 313; 101 U. S. 71. The M. G. & A. could not legally buy stock in another road: 40 *Ga.* 583; 43 *Ga.* 13. Authority to buy stock could not be conferred upon it: Civil Code, §§ 5800, 5780; 49 Fed. Rep. 424; 37 Fed. Rep. 449, 465; 40 *Ga.* 583;

93 *Ga.* 53. The two roads were competing roads: Charter of M. G. & A. Ry. Co.; 40 *Ga.* 583; 37 Fed Rep. 448; 49 Fed. Rep. 424; 50 Fed. Rep. 338; 72 Tex. 404, s. c. 1 L. R. A. 849; 24 Neb. 143, s. c. 8 Am. St. Rep. 165–178; 75 Tex. 434; 41 La. Ann. 970, s. c. 17 Am. St. Rep. 445; 37 Ohio St. 590; 97 Ky. 675; 161 U. S. 677–685, and cit.; 139 U. S. 24; 101 U. S. 71; 7 Atl. Rep. 368; 92 Fed. Rep. 735. For the same reasons the purchase of the M. G. & A. by the Central of Georgia was illegal and void. The right to construct branch roads does not carry with it the right to purchase roads already constructed: 23. Ohio St. 168–181; 67 Tex. 692–701. The fact that rates have not been changed does not affect the question: 161 U. S. 648–676; 15 L. R. A. 159; 6 L. R. A. 102. Equity may interfere by injunction and may appoint a receiver: 52 Am. St. Rep. 415; 50 N. J. Eq. 50–499; 17 L. R. A. 102.

*Lawton & Cunningham, Joseph R. Lamar, Thomas G. Lawson,* and *H. A. Jenkins,* for defendants: Contracts encouraging monopoly, or defeating or lessening competition, are void at common law: 16 Wall. 102; 104 *Ga.* 194–5; 40 *Ga.* 582; 65 *Ga.* 160; 10 *Ga.* 505; Greenhood, Pub. Pol. 670; Clark, Cont. 446; 20 Wall. 67. The incomplete sentence in section 5800 (Civil Code), "all such contracts and agreements shall be illegal and void," does not enact new law, but preserves the common-law rule: 104 *Ga.* 195; 40 *Ga.* 582. The common law preserved by section 5800 prohibits the making of contracts which are "injurious to the public interest": 104 *Ga.* 194; 161 Pa. St. 473, s. c. 24 L. R. A. 247; 1 L. R. A. 461; Spelling, Trusts, 75, 158; 52 Fed. Rep. 118, 646; 139 U. S. 89. The contracts prohibited must not only be injurious to the public, but must directly affect actual competition, important in amount and of controlling force in fixing rates. Competition which does not reduce rates or improve service has neither practical nor theoretical value: 171 U. S. 592, 594, 600; Id. 568; 31 Am. & Eng. R. Cas. 649; 1 Interstate Com. Rep. 631; 168 U. S. 145(6); 5 Am. & Eng. R. Cas. (n. s.) 86; 56 Fed. Rep. 947; 50 Fed. Rep. 309; 1 Interstate Com. Rep. 31. If section 5800 is not declaratory of the common law, but enacts a new rule, it needs subsequent legislation to define its limits or to enforce its pro-

visions. It is not self-executing, because, by the provisions of .5802, the legislature "shall enforce the provisions of this article by appropriate legislation." 3 Fed. Rep. 740; 31 Am. St. Rep. ·626; 10 Fed. Rep. 497; 30 S. W. Rep. 350; 45 S. W. Rep. 988; Spelling, Trusts, 223. The "appropriate legislation" as to railroads is found in the general railroad acts, each of which has authorized the purchase, sale, lease, or consolidation of connecting railroads, provided such contracts be not made between "competing lines." Acts 1881, p. 161; Acts 1891, p. 116; Acts 1892, p. 49; Acts 1894, p. 69; Civil Code, §§ 2173, 2179, 2180; 102 *Ga.* 436. As to legislative and contemporaneous construction: ·98 *Ga.* 813; ·55 N. Y. 367; 92 N. Y. 328; 149 N. Y. 367; 115 N. Y. 442. Even if they have competing points, the Middle ·Georgia & Atlantic and the Central are not "competing lines" within the meaning of the Civil Code, §§ 2173, 2179, 3668, nor is the consolidation prohibited by the constitution (Civil Code, :§ 5800): 40 *Ga.* 582; 102 *Ga.* 436; 46 Fed. Rep. 888; 35 Atl. Rep. 952; 91 Fed. Rep. 317, 318; 49 Fed. Rep. 419; 37 Fed. Rep. 462; 62 Fed. Rep. 328. The public policy in this State is the same as that existing in other States which prohibit the ·consolidation of competing lines: 161 U. S. 646; 32 Am. & Eng. R. Cas. 400; 161 U. S. 677; 7 Atl. Rep. 369; 47 Am. & Eng. R. Cas. 359; 35 O. St. 590. The constitution (Civil Code, ·§ 5799) encourages the building of branch roads. This is equivalent to declaring that a branch road is not a competitor within ·the meaning of § 5800 Irrespective of the merits of the case, .a receiver was properly refused: 46 Fed. Rep. 888; 103 *Ga.* .557; ·105 *Ga.* 494.

*Hoke Smith & H. C. Peeples* argued in support of the defense, for parties not of record but interested in the result.

LEWIS, J. This suit was brought in Putnam superior court by and in the name of the State of Georgia against the Central ·of Georgia Railway Company, the Middle Georgia & Atlantic Railway Company, and the Eatonton Branch Railroad. It was founded upon an executive order which was issued in the early part of the year 1899, upon a petition filed by certain citizens ·of Putnam county with the Governor; the main purpose of the

petition being to procure an executive order directing the at-torney-general to institute suit in the name of the State to set aside a certain contract of sale under which the two last-named roads were purchased by the Central of Georgia Railway Com-pany on the 31st of December, 1896, upon the ground that this contract of sale was in violation of art. 4, sec. 2, par. 4 of the constitution of this State. In the petition it was substan-tially alleged that these two companies, the Middle Georgia and the Central, were competing lines, and that the effect of this purchase by the Central was to destroy competition, and to create a monopoly in the business formerly enjoyed by both corpora-tions. It was especially charged that there was great competi-tion between the two companies at Milledgeville and at Machen, and several points were designated in the petition along the Middle Georgia & Atlantic Railway where it was alleged that the result of the contract of purchase by the Central was to de-feat competition at such places, and created in most of them a monopoly in the Central. The Central, through its counsel, filed an answer to the petition, specifically denying its allega-tions that the purchase of the Middle Georgia was designed or had any tendency whatever to defeat or lessen competition or to produce monopoly within the meaning of the constitution; alleging that the two roads were never rivals or competitors in the sense contemplated by the constitution, and that the effect of the contract of purchase was really of vast benefit to the public interests, the same having resulted in the reduction of passenger and freight rates, in the better equipment of the road, and in superior accommodations to its patrons and the public generally. This case came on to be heard before his honor Judge Hart, at chambers, on September 11, 1899, upon the prayer of the petition that the holding and operation of the Eatonton Branch and the Middle Georgia by the Central directly or indirectly be enjoined; and that until the final hear-ing of the case a restraining order be granted prohibiting the further operation of these two railroads by the Central; and that a receiver be appointed to take charge of the two roads, and all the corporate property belonging to them, and to hold, operate, and manage the same under the directions of the court;

in order that competition may be preserved, and the public interests protected, until the two roads are operated by their respective corporations as separate properties. On the 18th of September, after hearing argument of counsel, the judge below, having held up his decision until that date, passed an order refusing the injunction and receiver as prayed for, to which plaintiff in error excepted, and assigns the same as error in its bill of exceptions.

In 1889 what was known as the Eatonton and Machen Railroad Company was incorporated by an act of the legislature, with authority to build and operate a line of railway from Eatonton to Machen, and extend the same in either direction to Savannah and Atlanta. See Acts of 1889, p. 227. At the same session of the legislature (see p. 281) the name of the corporation was changed to the Middle Georgia & Atlantic Railway Company. During the year 1890 this line had been completed between the towns of Eatonton and Machen, and had been graded north of Machen nearly to Covington. In 1893 the road had been completed to Covington, and was being operaated from Eatonton to that point. In 1893 there were in Eatonton two separate and independent lines of railway, namely the Middle Georgia and the Central; the latter, through its receiver operating the Eatonton Branch under a lease made many years previously. It appears from the record that the line from Eatonton to Milledgeville, known as the Eatonton Branch Railroad, was completed about the year 1852, and this branch has never been under any separate or independent operation, but, upon its completion, the Central Railroad & Banking Company of Georgia leased the same; and it went into the hands of the receiver of the Central, by whom it was operated until October, 1893, when, under an order of the United States circuit court, this branch railroad was allowed to withdraw and did withdraw its lines from the control of the receiver, upon the showing made to the court by the receiver that this branch was not earning its operating expenses and annual rental. Upon assuming control of its road, the Eatonton Branch Railroad immediately entered into contract with the Middle Georgia & Atlantic, by which the latter corporation

was to operate its line temporarily, the net proceeds to be divided between the two corporations on a mileage basis. The Middle Georgia & Atlantic then began to run its trains from Milledgeville to Covington. On the 1st day of June, 1896, the Middle Georgia & Atlantic purchased by deed of conveyance the railroad and corporate franchises of the Eatonton Branch, and then became the owner of the line from Milledgeville to Covington, until it sold out its road and franchises to the Cen-. tral of Georgia on December 31, 1896. The affairs of the Central Railroad & Banking Company became liquidated under the receivership, and a reorganization was perfected by which all the property and franchises of that corporation passed into the custody and control of the new corporation, the Central of Georgia Railway Company. It owned and operated a line of railway from the city of Atlanta to the city of Savannah via Macon; and from Gordon, in Wilkinson county, to Milledgeville, in the county of Baldwin, besides other lines.

The suit in this case, and the relief therein sought, is based upon the following provision in the State constitution, embodied in section 5800 of the Civil Code: "The General Assembly of this State shall have no power to authorize any corporation to buy shares or stock in any other corporation in this State or elsewhere, or to make any contract, or agreement whatever with any such corporation, which may have the effect, or be intended to have the effect, to defeat or lessen competition in their respective businesses, or to encourage monopoly; and all such contracts and agreements shall be illegal and void." The case necessarily involves the vital question as to what is a proper construction to be placed upon this language in the constitution. Did the convention, in framing that instrument, intend to enact any new law, or declare any new principle in connection with contracts touching the defeat or lessening of competition, or the production or encouragement of monopoly? If so, what is that new principle? Can it be gathered from the words employed as to what sort of competition or monopoly is meant? We are left absolutely in the dark so far as provisions in the constitution are concerned, as no language whatever is used therein to throw any light on;

or give explanation touching the matter. We are not, how-ever, in absolute darkness as to the general principles of law that have been in existence from time almost immemorial, touching contracts of this nature ; that is, principles relating to the protection of the people against contracts preventing competition or creating monopolies. The common law has al-ways abhorred a monopoly and has encouraged competition in all legitimate businesses of the people, whether followed by in-dividuals or corporations. The purpose of such law is patent. One great object it has in view is to prevent such combination in trade, traffic, or other business as to concentrate it under one management and place it under such control of one person, company, or corporation, as to enable them unreasonably to op-press their patrons by exacting payment of extortionate and exorbitant prices. Such contracts are usually designated as those in restraint of trade, and are referred to in section 3668 of the Civil Code as "contracts in general in restraint of trade."

But it does not follow that the law ever intended to defeat all combinations that might be made in the business affairs of life, or to declare null and void all contracts that might in some particulars have a tendency to lessen competition or to restrain trade. It requires no argument to show that such a rigid construction, instead of being demanded by public pol-icy, would in many instances work great injury to the public, and seriously affect the prosperity of a country. Competition may be so unreasonable as not only to result in disaster to the competitors, but also in injury to the public. For instance, three competitors may be engaged in the same line of business in the fair conduct of which the public in a given community or section of the country is vitally interested. Public patron-age may not be sufficient to sustain them all. Each one is en-gaged in an earnest contest for the mastery of the situation. One may be more powerful than the others, and, on account of financial ability, may reduce charges for accommodations, con-veniences, or necessities, furnished the public, lower than the ac-tual expense of operating the business ; and, in this way, succeed in an extermination of the other two competitors, and this for the direct purpose of securing a monopoly, and raising prices

to an exorbitant and oppressive amount. Now, suppose the two weaker institutions should make such an arrangement or combination as to place the business of both under one management, and under the control of such an owner as would have the ability to compete with the remaining enemy in the field; would any court of law or equity declare such a contract void, though made for the purpose of destroying competition between the parties thereto? Numerous other illustrations might be given of unreasonable competition that might prove injurious to the public interests. By virtue of section 2176 of the Civil Code, such unreasonable competition, in the case of railroads, is provided against by requiring a new road constructed under the provisions of the act to be at least ten miles from the one already constructed.

When an effort, therefore, is made by a State to set aside contracts of this character on account of public policy, the vital test is whether or not such a contract is injurious to the public interests. In the text-books and decisions touching the common law on this subject we can find no well-settled definition of " restraint of trade "; and it would perhaps be impracticable to give any certain definition of the term which would be of universal application to every case that might arise involving the question of the validity of such contracts. The difficulty grows out of the fact of failure in the lawmaking power to specify what acts and agreements shall constitute restraint of trade, monopoly, trusts, etc. Spelling, in his work on Trusts and Monopolies, enters into a discussion on this subject, and on page 224 he uses the following language : " The fatality of any legislation which does not circumstantially define what shall constitute restraint of trade, but leaves it to the courts to determine the question by reference to the common law, is this : There is no settled or accepted legal definition of restraint of trade at common law. The rule of public policy which must be violated by an agreement in restraint of trade is a variable and indefinable quantity. As an English judge once said : ' It is an unbridled horse, which, when you have once mounted it, you know not whither it will go, or where it will land you.' The Federal judges especially have assumed such liberal dis-

cretion in the interpretation of the rule as to indicate that there
is in fact no rule, but that each decision should turn upon the
exigencies, environment, and circumstances of the parties and
the subject-matter.    In other words, there is no pole-star to
guide the judicial mind, but each judge evokes from his own
breast a proper decree upon the facts as presented in each case."
See also the subject discussed in Clark on Contracts, p. 446.
In the case of Leslie *v.* Lorillard, decided by the New York
Court of Appeals, October 16, 1888, 1 L. R. A. 456, Gray, J.,
in discussing this question on page 461, says: "Where, there-
fore, the provisions of agreements in restraint of competition
tend beyond measures for self-protection and threaten the public
good in a distinctly appreciable manner, they should not be sus-
tained.    The apprehension of danger to the public interests,
however, should rest on evident grounds; and courts should re-
frain from the exercise of their equitable powers in interfering
with and restraining the conduct of the affairs of individuals
or of corporations, unless their conduct in some tangible form
threatens the welfare of the public."    The decision in that case
was to the effect that a certain agreement of a steamship corpora-
tion to buy out a competing line, which line, for a considera-
tion, agreed to discontinue running vessels between certain ports,
was not void as in restraint of trade.    The reason for that rul-
ing was evidently based upon the idea that the facts and circum-
stances of that particular case did not show that the public in-
terests were injuriously affected.    In the case of Nester *v.* Conti-
nental Brewing Co. (Supreme Court of Pennsylvania), 24 L. R.
A. 247, it was held: "The true test of the illegality of a combi-
nation to restrict business is its effect upon the public interests."

In Spelling on Trusts and Corporations, 158, it is declared:
"But since the public interest is the controlling consideration
in this class of cases, the rule against restrictive contracts by
public servants does not extend beyond or in conflict with pub-
lic welfare.    Therefore a court will not declare a contract be-
tween common carriers illegal merely because it gives monop-
oly, where it does not appear that the public is injured, or that
either party to the agreement has exercised any function ex-
clusive of public rights."    And again on page 75, § 52, he says,

that "courts are not governed by any hard and fast rule in determining whether a particular contract is in restraint of trade and amenable to the rule of public policy rendering such contracts invalid, the test being whether the restriction is reasonable and necessary to the party's protection, the public interest being constantly kept in view." On page 76 the author advances the idea that it is not strange that decisions upon apparently similar facts are variable, and that it is almost impossible to deduce general abstract rules from them; that the courts have an almost unlimited range of discretion in deciding upon the facts of each case as presented, whether the restriction be reasonable and necessary, or inimical to the public interest, because calculated to stifle competition, and lead to extortion and oppression. In Fowle v. Park, 131 U. S. 97, Chief Justice Fuller, in discussing the question as to when the restraint of trade or the lessening of competition becomes invalid, in his opinion says: "Public welfare is first considered, and if it be not involved, and the restraint upon one party is not greater than protection to the other requires, the contract may be sustained. The question is whether, under the particular circumstances of the case, and the nature of the particular contract involved in it, the contract is, or is not, unreasonable." See also In re Greene, 52 Fed. Rep. 118, where the reasonableness of such a contract is made to depend upon whether it is more injurious to the public than is required to afford a fair protection to the party in whose favor it is secured. The court recognizes there that no precise boundary can be laid down as to when and under what circumstances the restraint would be reasonable, and when it would be excessive. See also Ellerman v. Chicago Co. (Court of Chancery of New Jersey), 23 Atl. Rep. 287–300.

The same doctrine touching the effect such contracts have upon the public has been more than once recognized by this court. It will be noted that the words cited above from section 3668 of the Civil Code refer to contracts in *general* in restraint of trade. It does not undertake to declare contracts in partial restraint of trade void. In *Holmes* v. *Martin*, 10 *Ga.* 503, it was decided: "A contract in general restraint of trade is void; but if in partial restraint of trade only, it may be supported,

provided the restraint be reasonable and the contract founded on a consideration." Lumpkin, J., in delivering the opinion in that case, on page 505 says: "The reason assigned for this difference is, that all general restraints tend to promote monopolies and to discourage industry and enterprise and just competition; whereas the same reason does not apply to special restraints. On the contrary, it may even be beneficial to the public that a particular place should not be overstocked with persons engaged in the same business." In the case of *Western Union Tel. Co.* v. *American Union Tel. Co.*, 65 *Ga.* 160, a contract between a railroad and telegraph company, vesting in the latter the exclusive right to use or occupy the right of way of the former for the erection and operation of its telegraph business, was held to be void. It will be seen that although that decision was made since the constitution of 1877, it was not based upon the provision in that constitution against such contract, but upon the common law; it being ruled that they were in general restraint of trade, tending to create monopolies, and thus against public policy. This question was discussed in the case of *Rakestraw* v. *Lanier*, 104 *Ga.* 188, by Justice Little. The contract in that case involved a restraint upon one of the parties from following his occupation at a given place. Justice Little, in his opinion on page 194, says: "It is, however, satisfactorily established that, as a matter of law, such a contract is to be upheld, if the restraint imposed is not unreasonable, is founded on a valuable consideration, and is reasonably necessary to protect the interest of the party in whose favor it is imposed, and does not unduly prejudice the interests of the public." Further, on page 195, he says: "In determining, however, whether such a contract is reasonable, the court will consider the nature and extent of the trade or business, the situation of the parties, and all the other circumstances." Authorities could be multiplied sustaining the position that at common law the test of validity of agreements relating to a restraint of trade, or, what is the same thing, to lessening competition and encouraging monopoly, is whether or not the public interests have been injuriously affected. But we think the above citations are quite sufficient to establish the doctrine.

The above doctrines of the common law have been repeatedly applied by the courts of this country to transactions between railroad companies. The first time the question was before this court as to whether one railroad could purchase the controlling interest in a competing line, and thus destroy the competition that formerly existed between them when they were operated as independent lines, was in the case of *Central R. R. Co.* v. *Collins*, 40 *Ga.* 582. The Central Railroad & Banking Co., which was chartered to build a railroad from Savannah to Macon, and the Southwestern Railroad Co., which was chartered to build a railroad from Macon to the Chattahoochee river, were about to purchase from the City of Savannah 12,383 shares of stock in the Atlantic & Gulf Railroad Company, which was chartered to build a road from Savannah to Bainbridge. It was alleged that the purpose of these two companies was to use the stock thus purchased to affect the management of the Atlantic & Gulf Railroad. An action was brought to enjoin the purchase of this stock and payment therefor, and to prohibit the two railroad companies from voting the stock, and from controlling the Atlantic & Gulf road, to the detriment of the interest of the complainants and the people of Georgia. There seems to have been no doubt in the case that these two roads were competing lines, each terminating at the seaboard, and penetrating at their extremities, and by their connections, the distant southwest, competing for the traffic and travel in that region of the country. On page 583, 6th headnote, it was decided: "It is part of the public policy of the State, as indicated by the charter of the several railroads from the seaboard to the interior, to secure a reasonable competition between said roads for public patronage; and it is contrary to that policy for one of said roads to attempt to secure a controlling interest in another, and any contract made with that view will be set aside by a court of equity as illegal, beyond the objects of the charter, and contrary to the public policy of the State." The decision was evidently based upon the common-law doctrine that contracts or agreements producing monopoly, or lessening or defeating competition, were void. It will be noted that that decision was rendered prior to the constitution of 1877. It

will be observed that Robert Toombs was of counsel for the complainants in that case, and, as such counsel, contended for the doctrine of the common law as therein enunciated. As a member of the constitutional convention of 1877, he is reputed to have drawn up this section of the constitution now under consideration. In construing this section of the constitution with reference to defeating or lessening competition and encouraging monopoly, the question naturally arises as to what was the nature of the competition and monopoly referred to. The constitution itself uses no explanatory language, and there is really nothing in the language employed to give these words any different meaning than what was almost universally recognized by judiciaries and legislatures for ages.

In construing a constitution, a safe rule is to give its words such significance as they have at common law; especially if there is nothing in the instrument to indicate an intention by its framers that the language in question should have a different construction. We think, therefore, that the purpose of the constitution was to declare no new principle. What is therein declared with reference to corporations is equally applicable to individuals. It will be noted that the provision is addressed to the General Assembly of the State, and declares that that body shall have "no power to authorize *any corporation in this State, or elsewhere,*" etc. There was a reason for applying the principle to corporations and not individuals; for the legislature could not authorize an individual to do an act against public policy; whereas the powers which corporations exercise are governed by the stipulations in their charters, and franchises conferred upon them by the lawmaking power. At common law a corporation could not make such contracts as contemplated by the constitution, without special grant of power. The object of the constitution was to restrict the legislature in this particular; and our judgment is that in this provision it was simply declaratory of the common-law principle recognized in the *Collins* case, the purpose being to make that principle, so far as corporations were concerned, the organic law of the State, and thus put it beyond the power of the legislature to grant to corporations any rights or privileges inconsistent with its terms.

Another proper rule to be observed and duly considered in the interpretation of a constitution is to determine what construction the legislative department of a State thereafter placed upon such provisions in enacting laws in relation thereto.  The legislature of the State has, in several railroad acts passed since the adoption of the constitution, authorized the purchase, sale, lease, or consolidation of connecting railroads; but has added *provisos* that such contracts shall not be made with competing lines. See Acts 1881, p. 165, sec. 15, where the proviso to this purchasing power is added, that "no railroad shall purchase a competing line of railroad, or enter into any contract with a competing line of railroad, calculated to defeat or lessen competition in this State."   See also Acts 1892, p. 49, sec. 13, where similar power is given with a like proviso which prevents the railroads from making such contracts with a *competing line of railroad*, calculated to defeat or lessen competition.   These provisions of law are embodied in the Civil Code, §§ 2173, 2179.   In 6 Am. & Eng. Enc. L. (2d ed.) 931, it is held: "A constitutional provision is to be construed with reference to the principles of the common law," and the common law will be upheld in the absence of an apparent contrary intention.   It is also stated that "a contemporaneous legislative exposition of a constitutional provision is entitled to great deference."   See numerous authorities cited in the text.   It will thus be seen that the policy of this State is the same that exists in some other States of this Union, where there are constitutional and statutory provisions prohibiting the consolidation of competing lines.

In the case of Cumberland Valley Co. *v.* Gettysburg Co., decided by the Supreme Court of Pennsylvania in 1896, 35 Atl. Rep. 952, it was decided, in effect, that railroad companies whose roads approach their point of connection almost at right angles are not competing lines.   This question as to what constitutes competing lines of railway within the meaning of the law was discussed in the case of State *v.* Montana Ry. Co., 11 Am. & Eng. R. R. Cases, 353, where it was ruled that two roads were competing lines when their relation to one another was such as to enable them to cut rates to principal or terminal points.   Hunt, J., in delivering the opinion of the court, on page 365 declares:

"The true rule is, that whether two railroads are parallel or competing is a question of fact, of physical fact. . . Exact parallelism, however, is not what is included in the meaning of the words of the constitution forbidding consolidation of parallel railroads. A reasonable construction must obtain. . . We should say that by parallel railroads are meant railroads running in one general direction, traversing the same section of the country, and running within a few miles of one another throughout their respective routes. They may or may not be competing. That depends upon their termini, and their commands of traffic." Again, on page 266, he says: "Whether lines of road are competitive or not depends upon the business of the companies, the conduct of the roads by their authorities, their channels of traffic, and generally — nearly always — upon whether the roads extend for transportation from and to the same points along their routes." There is nothing in the record in this case to indicate that the Central and Middle Georgia roads are *competing lines*, in the light of the above authorities. The Central purchased a branch road from Gordon to Milledgeville. There it connects with the Middle Georgia. For nearly fifty years has the Eatonton Branch been chartered, and yet at no time has it been operated as an independent road. On the contrary, it was leased and operated by the Central as a continuation of this branch line from Gordon to Milledgeville, and on to Eatonton. In the *Collins* case, 40 *Ga.* 633, the relation of this Eatonton Branch to the Central was considered and discussed by this court. It was there held that the Southwestern, Waynesborough, and Eatonton roads were *feeders* to the Central; their interests were in harmony, and both the public and the stockholders of each road were interested in their acting in concert. If, then, it was treated not as a competitor at that time, we can not see upon what theory or method of reasoning it can be contended that a further extension of this branch, not in the direction of the Central's line nor within its territory, but to a point within the territory of a competing line, namely the Georgia Railroad, would make the line a competitor of the Central. It was also decided in the *Collins* case that a line termed then the Waynesborough line, which connected with the Central at

Millen and ran to Augusta, was not a competing line of the Central, but a feeder; yet it was doubtless true that when the Central purchased that line, it necessarily lessened competition at Millen. But, on the other hand, it increased competition at Augusta after its absorption by the Central, by giving another direct line from that point to the seaboard. There is nothing, however, in this case which shows that, from the location of these two roads, the Central and Middle Georgia, and the direction which each ran from their connecting point at Milledgeville, being almost at right angles, they were competing lines in any legal sense of that word.

It is insisted, however, that Milledgeville was a competitive point for these roads and the Georgia road, and the purchase by the Central of the Middle Georgia had the effect of lessening this competition. But it by no means follows that because the number of competitors in a given business is diminished, that competition is thereby lessened to the injury of the public. The facts in the record really show that prior to this contract of purchase the Georgia Railroad and the Middle Georgia acted in concert and harmony by an arrangement or understanding they had with reference to the transportation of through freight, and that the competition then was really between these two roads on the one hand and the Central on the other. It would seem, therefore, that the effect of the purchase was simply to transfer the competition to the Middle Georgia and Central on the one part and the Georgia on the other. It is further contended that at Machen the Middle Georgia crossed the Central, that road having purchased and operating the road from Macon to Athens, which passes through Machen, and that the effect of the purchase was to diminish competition at Machen. On the other hand, there is overwhelming testimony in the record to show a very marked increase of competition by this consolidation of the two roads in question in Covington, and that this competition was increased at the various stations along the line of the road between Machen and Covington; and the testimony seems conclusive that the general interests of the public along the line of this branch road from Milledgeville to Covington were benefited by its consolidation with the Central. Besides,

it seems that the sale of its road by the Middle Georgia was an absolute necessity. It was then in a run-down condition. Its road-bed was in such a fix as to render transportation over the same absolutely dangerous to life and property. Citizens interested in its traffic, it seems, petitioned the railroad commissioners to have the road put in good order, and proceedings in court were actually instituted for this purpose. It appears that over a quarter of a million dollars were lost by the owners of this road, and its president swore on this trial that they could not run it safely to life and property, owing to its physical condition, and that the sale of it to somebody became absolutely necessary. It appears that an effort was made to sell it to the Georgia Railroad, which declined to become the purchaser. Then the Central was approached, became the purchaser, and at once commenced the operation of the road. Its condition was thereafter greatly improved, to the general satisfaction of its patrons throughout the entire length of the line. We quote the following from the learned opinion of Judge Hart, embodied in his decision in this case:

"They [meaning the Middle Georgia] were then charging four cents per mile as their passenger tariff, and the maximum freight charges the railroad commission would allow. Immediately after the purchase by the Central, passenger tariff was reduced to three cents per mile, and the freight tariff, where changed, was reduced from 2 to 50 per cent. The road-bed was put in good and safe condition. Its equipment is full and complete, and the service is generally satisfactory to its patrons. No one complains that the road is not now giving a better, safer, and cheaper service than when the Middle Georgia was operated as an independent line. Scores of affidavits were read on the hearing, and with remarkable unanimity affiants asked that there might be no breaking up of the present system by the appointment of a receiver. The court is of the opinion that the purchase has been beneficial to every business, every shipper, every person living on its line, except perhaps to the merchants of Shady Dale who had their freights delivered to them free of charge from the depot of the Central, or individuals at Milledgeville who had free passes given them as an

inducement to route their freight over a particular line. It was competition, no doubt, at these two points which induced these concessions; but the people as a whole have been benefited both in convenience and safety in travel, as well as in saving of freight and passenger tariff. It is susceptible of proof that in reduced freight charges the people of Eatonton and Putnam county save annually over $20,000. A lumber-dealer in Covington swears that he saves annually $1,800 on the single item of lumber handled by his firm." We have read this voluminous record of evidence entirely through, and can say, from the facts developed on the trial, that the above conclusion of Judge Hart touching the beneficial effects of this purchase by the Central to the public at large along the line of this branch road was fully authorized. In determining whether this contract defeated or lessened competition within the meaning of the constitution, we must look at its effects, in the light of all the facts and circumstances of the case, along the entire line of the road in question. The evidence in this case tends to establish the fact that the traffic at Machen and Shady Dale, where it is claimed competition was lessened, does not exceed 2.6 per cent. of the traffic on the whole line; and yet the people of that community reap the same advantage in the reduction of freight and passenger tariffs as the people along the road from one end of the line to the other. It is the policy of this State, both in its constitution and its statutes, to prevent a railroad from purchasing a competing or rival line whenever the effect of such a purchase would be to defeat or lessen competition; but in considering whether or not a transaction has had this effect, we must look at the results in their entirety, and the effect upon the general public interested in the traffic of the road along its line. If that general effect be to increase competition to a far greater extent than it has been diminished at particular points, it can not, with reason, be said that competition has been defeated or lessened. In point of fact it has actually been increased.

But it is insisted in this case that if competition be lessened anywhere, it matters not what may be the general effects upon the public, and it matters not whether any loss has accrued to

any one from an increase of charges for transportation of freight or passengers, the constitution has been violated, and the contract is, therefore, void. It is true that the doing of an illegal act can not be justified upon the plea that no harm has resulted; but it is perfectly legitimate to look at the purposes for which a law is enacted, in determining its true intent and meaning. The object of the law against defeating or lessening competition was to prevent it being placed in the power of one, whether individual or corporation, to so control rates of trade and traffic as to increase them to an unreasonable amount. If a transaction, therefore, instead of having such a result, has an opposite effect, it furnishes, to say the least of it, a strong argument that that law has not been violated; and the argument becomes more overwhelming when there is nothing in the environment and business of the parties to place them in the position of rivals, or real competitors. As Judge Hart has correctly said in his opinion: "It is the declared policy of this State to prohibit railroads from purchasing competitive or rival lines, but it is also its declared policy to encourage the great trunk lines to buy, build, and operate branch or feeding lines. Both policies are equally wise. The former is to prohibit contracts in restraint of trade; the latter is to build up our great undeveloped interior. Railroads should be prohibited from doing the first, and should be encouraged to do the last." There is nothing in the constitution indicating any hostility whatever to the extension of lines of railway by the construction or purchase of branch roads, or the purchase of connecting lines. On the contrary, under section 5799 of the Civil Code, it is provided that in the event the charter of any corporation is altered or amended, such corporation shall hold its charter subject to the provisions of this constitution. The object of that was to subject such corporations to the taxing power of the State, although exempted therefrom under their original charters. But so jealous was the convention in protecting the rights of the railroads to construct, operate, or control branch roads, that it was provided that section should not extend to any amendment for the purpose of allowing any existing road *to take stock in or aid in the building of any branch road.* It would seem man-

ifest therefore, that the following provision in the constitution, with reference to preventing the General Assembly from giving power to any corporation to make a contract to defeat or lessen competition, or to buy shares of stock in any other corporation, had no reference whatever to the purchase, ownership, and control of branch roads; and they, therefore, could not have been regarded as competing lines to the main roads with which they might make connection.    As the result of this policy, great trunk lines have been extended in this country half across the continent.    Doubtless in the purchase of connecting lines and branch roads competition was lessened at given points, but the general effect of these consolidations and connections has really been to increase competition, has added greatly to the public convenience, furnished greater and more commodious facilities for traveling, has operated to reduce the cost of transportation, has brought remote parts of the country in close proximity, as it were, to each other, has developed resources that would otherwise have remained dormant, by opening up the markets of the world to the products of the land, and has generally contributed to work to the welfare and prosperity of the people.

Even if we are incorrect in our position that the provision in the constitution with reference to defeating competition or encouraging monopoly is only an embodiment of the common law upon the subject, and if it contains a new principle unknown to the common law, then the clause in question is evidently not self-acting, for no light is thrown upon the new meaning intended to be given the words used.    It would follow, therefore, that appropriate legislation would be necessary to carry into effect such a new principle, whatever it might be.    Under the provisions of section 5803 of the Civil Code it is provided that the General Assembly shall enforce the provisions of this article by appropriate legislation.    In this case, then, the courts would be constrained to decide that the appropriate legislation contemplated is embodied in the general railroad acts, to which we have above referred, where the purchase, sale, lease, or consolidation of connecting railroads is allowed, provided the contracts were not made between *competing lines.*    So at last the judiciary would be driven to the necessity, whenever the con-

test was made, in determining whether or not such contracts were legal, to decide the question as to whether they were between competing lines, and not simply lines that had competing points where competition was lessened to a degree insignificant when compared to its increase at various other points, and the benefits to the public generally along the line of transportation.    When the State appeals to the courts in such matters, she occupies the position of a representative of the public, whose rights, if they have been infringed by a violation of the constitution or the laws, will be zealously protected by the courts. For the same reason courts should deny her prayer, if it appears on trial that granting the relief sought would be productive of greater injury to the public than the wrongs of which complaint is made.    There was ample evidence in this case to authorize the conclusion of the judge below that the consolidation of the two lines of railroad involved did not defeat and was not intended to defeat or lessen competition, or to encourage monopoly, in the sense in which those words were used in the constitution; that these roads were not competing lines; and that the public interests were in·nowise injured by their consolidation.    The judgment of the court, therefore, refusing an injunction and the appointment of a receiver is affirmed.

*Judgment affirmed.    All the Justices concurring.*