34558.   BEAZLEY *et al. v.* DEKALB COUNTY *et al.*

Decided March 18, 1953—Rehearing denied April 1, 1953.

*W. Harvey Armistead, Robert W. Spears, Wm. G. Grant, Grant, Wiggins, Grizzard & Smith*, for plaintiffs in error.

*Roy Leathers, Solicitor-General, J. A. McCurdy, Dan Mac-Dougald Jr., MacDougald, Troutman, Sams & Schroder, J. Robin Harris, Eugene Cook, Attorney-General*, contra.

*Tye, Cooper & Bell, Marshall, Greene, Baird & Neely, Heyman & Abram, Alston, Sibley, Miller, Spann & Shackleford, Spalding, Sibley, Troutman & Kelley*, as amici curiae.

TOWNSEND, J. ▮ Upon the call of the case for hearing before the trial court on the rule nisi, the intervenor moved for a continuance on the ground that he had been out of town and had not known about the proceeding until four or five days before the hearing, and that he had not had ample time in which to locate witnesses and secure their testimony in support of his intervention. No witnesses had been subpoenaed in his behalf at that time. Code § 81-1419 provides that "applications for continuances are addressed to the sound legal discretion of the

court." Code § 81-1416 provides that "in all cases the party making an application for a continuance must show that he has used due diligence." The discretion of the trial court in granting or refusing a continuance will not be disturbed by the appellate court unless it appears to have been manifestly abused. *Stanley* v. *Amos*, 79 *Ga. App.* 297 et seq. (53 S. E. 2d, 568); *Clay* v. *Barlow*, 73 *Ga.* 787 (2); *Betenbo* v. *Brooks & Tabor*, 17 *Ga. App.* 754 (88 S. E. 411). Also, this is a civil case in which the State is a party and, under the provisions of Code § 81-1005, the courts shall give preference to such cases and use "all the power vested in them by law to bring such cases to a speedy trial." In view of the wide discretion vested in the trial court on the question of continuances generally, and in view of the provisions of Code § 81-1005, where the State is a party to a civil action, the trial court did not abuse its discretion in refusing the continuance.

■ The transfer of this case from the Supreme Court to the Court of Appeals adjudicates that no construction of the Constitution of Georgia or question as to the constitutionality of any statute is involved herein. The jurisdiction of the Court of Appeals extends to decisions of questions of law which involve application in a general sense of unquestioned and unambiguous provisions of the Constitution to a given state of facts, including the question of whether a resolution of the county commissioner is unconstitutional because in excess of powers conferred by our State Constitution. *Maner* v. *Dykes*, 183 *Ga.* 118 (187 S. E. 699); *Nilsen* v. *City of LaGrange*, 183 *Ga.* 742 (189 S. E. 511); *City of Waycross* v. *Harrell*, 186 *Ga.* 833 (199 S. E. 119); *Moore* v. *City of Tifton*, 207 *Ga.* 443 (62 S. E. 2d, 182); *Carter* v. *Bishop*, 209 *Ga.* 146 (71 S. E. 2d, 216). It is contended that the county resolution in question is in violation of article VII, sec. VII, par. V of the Constitution of Georgia (Code, Ann., § 2-6005), providing that revenue-anticipation obligations may be issued by any county when such political subdivision is authorized by the Revenue Certificate Law of 1937 as amended.

■ Contrary to the usual legislative scheme, by which the acts of the General Assembly follow the provisions of the Constitution, here the act comes first, granting to counties and municipalities certain powers (Ga. L. 1937, p. 761; 1939, p.

362). Then comes the constitutional provision of 1945 (art. VII, sec. VII, par. V, Code, Ann., § 2-6005), which provides in part: "This authority shall apply only to revenue anticipation obligations issued to provide funds for the purchase, construction, extension, repair or improvement of such facilities and undertakings as are *specifically* authorized and enumerated by said Act of 1937 as amended by said Act of 1939." (Emphasis added.)

Under the Revenue Anticipation Certificate Law of 1937 as amended in 1939 (Code, Ann. Supp., Ch. 87-8), a county (Code, Ann. Supp., § 87-802 (b)) may issue revenue-anticipation certificates to finance in whole or in part the cost of the acquisition, construction, reconstruction, improvement, betterment, or extension of any undertaking (Code, Ann. Supp., § 87-803 (c) (1)), and do all things necessary or convenient in the exercise of the powers herein granted (§ 87-803 (e)). An undertaking as used in Code (Ann. Supp.), § 87-803 (c) (1), supra, under the terms of the law (§ 87-802 (a)), includes the following revenue-producing undertakings (§ 87-802 (a) (2)): highways, parkways, airports, docks, piers; wharves, terminals, and other facilities. Since the authority is limited by the constitutional provision hereinbefore quoted to undertakings *specifically* authorized, the words "and other facilities" are not considered in determining whether or not the undertaking proposed by the resolution of the county commissioner is within the authority granted. This leaves in the particular category under consideration "highways, parkways, airports, docks, piers, wharves, and terminals."

The meaning of the word "terminals" therefore becomes material in order to determine whether the undertaking is authorized by the statute and not excluded by the constitutional provision.

The structures sought to be built are, in the language of the resolution of the Commissioner of Roads and Revenues of De-Kalb County, the constitutionality of which document is under attack, "truck and railroad freight terminal facilities." The law *specifically* authorizes the construction of "terminals". The undertaking, however, is specifically set forth in the resolution only as "16 strip type masonry buildings with railroad sidings

in the rear the full length of each building, and the front located far enough from the project streets to permit complete off-street parking of trucks loading and unloading, the construction of the necessary roads in the immediate area of said railroad freight terminal facilities, a complete system of railroad sidings, the necessary storm and sanitary sewer facilities, fire protection system, street and park lighting, parking areas, and other purposes necessary, incidental or appurtenant thereto." The only language in the resolution indicating the purpose to which the undertaking is to be put is as follows: "The truck and railroad freight terminal facilities of the County of DeKalb, Georgia, are wholly inadequate for the economic and other needs of said county and the lack of such adequate truck and railroad freight terminal facilities seriously affects and retards the economic development of said county, and it is imperative and essential for the economic welfare and the proper development of the business and commerce of said county that adequate truck and railroad freight terminal facilities be constructed and acquired in said county as provided by this resolution."

The intervenor contends that the undertaking proposed by the resolution is not a terminal within the meaning of the statute, such as to be authorized by the constitutional provision hereinbefore quoted. The Constitution, as previously pointed out, permits anything specifically authorized by the statute. Terminals are specifically authorized, but the statute does not define them. "Terminals" as used in the statute is given the same significance and position as "highways," "parkways," "airports," "docks," "piers," and "wharves." None of these is defined. Code § 102-102 provides: (1) that the ordinary signification shall be applied to all words, except words of art, or words connected with a particular trade or subject matter, when they shall have the signification attached to them by experts in such trade or with reference to such subject matter; and (9) in all interpretations, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy. Webster's New International Dictionary (2d ed., 1951) gives, as one definition of the word terminal, "any freight or passenger station central to a considerable area or a junction station of a carrier line."

Older editions confine the meaning of "terminal" in connection with transportation to railroads. However, long strides in transportation have been made in modern times, and where transportation, or the bulk of it, used to be by railroads and steamships, now a great deal is done by trucks on highways and by air. In ordinary conversation one may today hear another state that he is on his way to the "bus terminal" or to the "airport terminal." Another definition of Webster's New International Dictionary is "either end of a carrier line, as a railroad, trucking or shipping line or airline, with freight and/or passenger stations, yards and offices." In 1937, when the Revenue Anticipation Certificate Act was passed by the General Assembly of this State, the fact that freight and passengers were being moved by air, bus, truck, ship, and rail was well known to it, and the need for storage places for freight and housing for passengers employing these means of transportation was also well known. In authorizing the construction of terminals, the General Assembly necessarily contemplated the construction of something that would produce revenue. It appears that this undertaking on the part of DeKalb County is a revenue-producing one, properly designated a terminal, which will be a place to store freight in connection with and as an adjunct to commerce by air, highway, water, and railroad. While DeKalb County is not on the coast or accessible to river transportation, freight can originate by water and wind up in this terminal. The undertaking proposed by DeKalb County is in keeping with the meaning of the word "terminal" as used in the act of the General Assembly authorizing it, and it is obvious that the General Assembly in passing the law intended to provide for such projects. It is contended that the meaning of the Railroad Commission Act of 1907 (Ga. L. 1907, p. 72) confines the meaning of the word "terminal" to railroads. Also, the meaning is sought to be gathered from the Savannah District Authority Act (Ga. L. 1951, p. 190), and the State Ports Authority Act (Ga. L. 1945, p. 464). There is nothing in any of these statutes which requires a different conclusion from that here expressed.

■ It is contended that certain costs included in the resolution under consideration are not specifically provided for in the act, and are therefore in violation of the constitutional pro-

vision authorizing revenue-anticipation certificates (Code § 2-6005). These are: (1) payment of cost of operation and maintenance of said project for a reasonable time after completion of the project, in such amount or amounts to be certified to be necessary by the trustee; (2) cost of insurance prior to completion of the project; (3) cost of equipment to be used in connection with the project; (4) payment of cost of furnishings; and (5) advertising expenses, contingent expenses, and administrative expenses of the county. Code (Ann. Supp.) § 87-803 (c) (1), supra, authorizes the doing of all things necessary or convenient in the exercise of the powers herein granted; and, while the Constitution limits the powers to those specifically granted, it must not be construed so that nothing specifically authorized could be done for the want of power to do those things necessarily and reasonably incident to its ultimate accomplishment. The things enumerated as being unauthorized are necessarily incidental to the performance of the specific undertaking. Things necessary and incident to granted powers must be implied as a part thereof. See State of Oklahoma ex rel. City of Shawnee v. Williamson, 186 Okla. 278 (97 Pac. 2d, 74, 125 ALR 1389), holding that a proposed bond issue for construction of a railroad crossing was a proper and lawful purpose for the issuance of bonds, notwithstanding that included therein was the cost of paving, there being a constitutional inhibition against the issuance of paving bonds. There it was held that the cost of paving was incidental and necessary to the completion of the improvement. The charges complained of, being incidental to the express power authorized by the statute, do not render the resolution in violation of the Constitution, as contended by the intervenor.

■ It is further contended that the resolution in question would tend to have the effect of defeating or lessening competition and encouraging monopoly, in contravention of article IV, sec. IV, par. I of the Constitution of 1945, which provides that any contract or agreement having this effect shall be illegal (Code, Ann., § 2-2701). This provision of the Constitution of 1945 "is in substance the same as art. 4, sec. 2, par. 4 of the Constitution of 1877, and its meaning is that fixed by construction by this court in State v. Central Railway Co., 109 Ga. 716

(35 S. E. 37), while it was a part of the previous Constitution, and it does not declare any new principle of law and has the same meaning as the Code, § 20-504." *Griffin* v. *Vandegriff*, 205 *Ga.* 288 (1) (53 S. E. 2d, 345). As stated in *State of Georgia* v. *Central of Ga. Ry. Co.*, 109 *Ga.* 716, 722 (35 S. E. 37, 48 L. R. A. 351): "One great object it has in view is to prevent such combination in trade, traffic, or other business as to concentrate it under one management and place it under such control of one person, company or corporation, as to enable them unreasonably to oppress their patrons by exacting payment of extortionate and exorbitant prices." Nothing contained in the resolution indicates that the proposed undertaking would have the power to oppress patrons thereof or demand extortionate payments from them; but, on the contrary, the county specifically covenants in the resolution that "all leases entered into for the facilities of said project, or any part thereof, shall be for reasonable and fair rentals," and that "all such leases shall provide that any rentals due thereunder shall be paid directly . . to said Trustee for deposit in the Project Revenue Fund created pursuant to this resolution and shall be applied by said Trustee solely in the manner provided in this resolution." In *State of Georgia* v. *Central of Georgia Railway Co.*, supra (headnote 1), it was further held that "a combination of railroad lines, whatever the form adopted for bringing it about, is not violative of this paragraph of the Constitution, even though it might lessen or defeat competition at some point or points, if, as a general result of the combination, the public at large, as distinguished from the people of special or particular communities, was in consequence benefited." It would seem that the undertaking here, a joint terminal for truck and rail freight, would fall into this general category, and in consequence would not be in restraint of trade so as to make the project illegal as a monopoly. This contention is without merit.

■ ■ On the question of the feasibility of the projected operation, there was testimony that there have been 53 large new industrial plants located in DeKalb County since 1940 and that terminal facilities are presently highly inadequate; that there were in Fulton and DeKalb Counties in 1951, 2000 acres of land devoted to terminal-type operation, of which only a small

percentage was in DeKalb County; that expert opinion is that 4000 acres will be in use for such purposes by 1960; that the project in question involves 120 acres; and that its location in relation to county-land uses, industrial areas, and transportation facilities is the best that can be obtained for the purpose. The average amortization is set up at $750,000 per year, plus $200,000 for operating expenses. At full capacity, on a rental basis of 72 cents per square foot (the estimated rental value), the project would bring in $1,400,000. If only three-fourths of this income were realized, the project would still have a surplus of $100,000 for reserves or prior amortization. This was in direct conflict with testimony of the intervenor that an additional 2,000,000 feet of storage space was greatly in excess of that needed in the Fulton-DeKalb area, was more than the total amount presently existing in those counties, and that the revenue could not be expected to exceed an average of $900,000 per year. Such testimony raised issues of fact for the determination of the trial court. *Dade County* v. *State of Georgia,* 202 *Ga.* 191 (42 S. E. 2d, 439). While the burden, in a bond-validation proceeding, is upon the State to establish the sufficiency of the revenues to be produced (*Darby* v. *City of Vidalia,* 75 *Ga. App.* 804, 44 S. E. 2d, 454), yet, where the State has made out a prima facie case, the burden is upon the intervenors to introduce evidence in support of their contention. *Dade County* v. *State of Georgia,* 77 *Ga. App.* 139 (1) (48 S. E. 2d, 144). The judgment of the trial court on an issue of fact will not be disturbed where there is no error of law. *Edge* v. *Summers,* 179 *Ga.* 635 (176 S. E. 483) ; *Hyde* v. *Fornara,* 74 *Ga. App.* 438 (2) (40 S. E. 2d, 151).

■ On the question of the use to which the undertaking will be put, the Commissioner of Roads and Revenues of DeKalb County testified in part as follows: "[This is] a terminal where freight coming in by freight train, or by truck or by air can go there and be stored, it can be taken off the vehicles of transportation and have a place to store it and distribute it over the southeast . . a terminal where goods will be disposed of in an orderly manner. This terminal I am building is to have warehouses which are to be leased to members of the public, tenants of the county, who will hold permanent space in it for

the storage of any goods, wares and merchandise they wish to put in it, whether coming over the railroad or the truck lines to that point or not . . a place to receive goods which have been transported over a common carrier to the end of its destination, and to hold these goods for delivery to the consignee, and they would be stored temporarily until the consignee picks them up." From this evidence the trial court was authorized to find that these purposes were in keeping with the intention of the General Assembly in enacting the law authorizing the undertaking, and that these purposes are not offensive to the constitutional provisions (Code §§ 2-6005, 2-2701) when applied to the facts of this case, as contended by the intervenor.

The court did not err in entering judgment in favor of the validation of the revenue-anticipation certificates.

*Judgment affirmed. Gardner, P. J., and Carlisle, J., concur.*