18253.   BEAZLEY *v.* DeKALB COUNTY *et al.*

42

Argued July 14, 1953—Decided September 15, 1953.

*Robert W. Spears, Wm. G. Grant, Grant, Wiggins, Grizzard & Smith,* for plaintiff in error.

*Spalding, Sibley, Troutman & Kelley, R. B. Troutman,* for parties at interest not parties to record.

*MacDougald, Troutman, Sams & Schroder, Dan MacDougald, Jr., J. Robin Harris, Julius McCurdy, Roy Leathers, Solicitor-General, Eugene Cook, Attorney-General, Wayman E. Cobb,* contra.

*Moise, Post & Gardner,* for parties at interest not parties to record.

Hawkins, Justice. This case involves the right of DeKalb County to issue revenue anticipation certificates in the sum of $12,000,000 for the acquisition and construction of so-called "truck and railroad freight terminal facilities" under what are commonly referred to as the Revenue Certificate Laws of 1937 (Ga. L. 1937, p. 761) as amended by the act approved March 14, 1939 (Code, Ann. Supp., Chapter 87-8). Certiorari was granted because the case deals with a matter of importance and great public concern, in that it involves a construction of these important public statutes which will be of frequent application, and dealing with the powers and duties of public officials of every political subdivision of the State, such as counties, cities, and towns, and the application of a constitutional provision (Code, Ann., § 2-6005) to these statutes, and presents a question of importance with State-wide application which has not previously been passed upon by this court. It might also be stated here, as will be pointed out more fully hereinafter, that the case involves one of the fundamental principles and foundation stones upon which our system of government was founded, which is free enterprise.

Under the amendment of 1943 to article VII, section VII, paragraph I of the Constitution of 1877, and under the Constitution of 1945 (article VII, section VII, paragraph V; Code, Ann., § 2-6005), it is expressly provided that revenue anticipation certificates shall be issued only to provide funds for the purchase, construction, extension, repair, or improvement of such facilities and undertakings as are "specifically authorized and enumerated" by said act of 1937 as amended by said act of 1939.

Facilities and undertakings "specifically authorized and enumerated" by these acts fall within the following general classifications: (1) causeways, tunnels, viaducts, bridges, and other crossings, highways, parkways, airports, docks, piers, wharves, terminals; (2) systems of waterworks and sewerage; (3) dormitories, laboratories, libraries, fairs and exhibitions; (4) parks, playgrounds, athletic fields, etc.

The resolution of the county commissioner designates the facility and undertaking here proposed as "truck and railroad freight terminal facilities," and therefore it becomes necessary to construe the acts and define the word "terminals" as there used, and to determine whether, under the facts of this record, the proposed undertaking comes within that designation. In doing so, we are confronted first with the well-established general rule that counties and municipal corporations can exercise only such powers as are conferred on them by law, and a grant of power to such corporations must be strictly construed; and such a corporation can exercise no powers except such as are expressly given or are necessarily implied from express grant of other powers, and if there is a reasonable doubt of the existence of a particular power, the doubt is to be resolved in the negative. *Albany Bottling Co.* v. *Watson,* 103 *Ga.* 503 (30 S. E. 270); *Georgia Ry. &c. Co.* v. *Railroad Commission of Ga.,* 149 *Ga.* 1 (98 S. E. 696, 5 A. L. R. 1); *Lockwood* v. *Muhlberg,* 124 *Ga.* 660, 662 (53 S. E. 92); *Irwin* v. *Torbert,* 204 *Ga.* 111, 116 (49 S. E. 2d 70), and cases there cited.

In addition to this general rule of strict construction, we have in the instant case the emphatic and mandatory restrictive provisions (*City of Valdosta* v. *Singleton,* 197 *Ga.* 194, 211, 28 S. E. 2d 759) of the 1943 amendment to the Constitution of 1877, and article VII, section VII, paragraph V of the Constitution of 1945

(Code, Ann., § 2-6005), that such municipalities shall issue revenue anticipation certificates only to provide funds for such facilities and undertakings as are "specifically authorized and enumerated" by the acts of the General Assembly referred to.

It thus appears that "terminals" are expressly authorized and enumerated in the act of 1937, and the question is presented, what is a "terminal" within the meaning of that word as used in that act. Webster's New International Dictionary (2d ed., 1951) defines the word "terminal" as: "6. (a) Either end of a carrier line, as a railroad, trucking, or shipping line or airline, with freight and/or passenger stations, yards, and offices; (b) Any freight or passenger station central to a considerable area or a junction station of a carrier line; . . . (d) a town lying at the end of a railroad—more properly called a terminus." As pointed out by the Court of Appeals in its opinion (*Beazley v. DeKalb County*, 87 *Ga. App.* 910, 75 S. E. 2d 657), "terminals" as used in the statute is given the same significance and position as "highways," "parkways," "airports," "docks," "piers," and "wharves," each and every word referring to ways and means of transporting freight and passengers, and Code § 102-102 provides that the ordinary signification shall be applied to all words, except words of art, or words connected with a particular trade or subject matter; and in all interpretations the courts shall look diligently for the intention of the General Assembly, keeping in view, at all times, the old law, the evil, and the remedy. With the words of the statute and these rules in mind, the conclusion is inescapable that the word "terminal" as used in the Revenue Certificate Law means only a place provided by or for common carriers, whether over rail, over water, over public highway, or in the air, for the purpose of receiving and discharging passengers, or for the purpose of receiving and delivering freight, including buildings and structures incidental to those purposes, such as shelters and enclosures for the comfort and convenience of passengers or for the care and safety of freight pending shipment or delivery to consignee or to connecting carriers.

That the word "terminals" appearing in the Revenue Certificate Act was used by the General Assembly in the sense above indicated is evidenced by the context and by the meanings of the words with which it is associated. As already pointed out,

it is used in connection with the words "highways," "parkways," "airports," "docks," "piers," and "wharves," all having reference to ways, means, and facilities of transportation, a subject matter in which the general public is concerned, and over which the government has always exercised control and regulation. In *Ragland* v. *Justices of the Inferior Court*, 10 *Ga.* 65, 71, it is said that, "when a word or words are of doubtful meaning, in the application of a statute, the subject matter may dissolve the doubt and fix their meaning, so as to make it harmonize with the object of legislating upon the subject matter at all"; and in Virginia *v.* Tennessee, 148 U. S. 503, 519 (13 Sup. Ct. 728, 37 L. ed. 537), it is said: "It is a familiar rule in the construction of terms to apply to them the meaning naturally attaching to them from their context. *Noscitur a sociis* is a rule of construction applicable to all written instruments. Where any particular word is obscure or of doubtful meaning, taken by itself, its obscurity or doubt may be removed by reference to associated words. And the meaning of a term may be enlarged or restrained by reference to the object of the whole clause in which it is used." See also 66 C. J. S. 607, 608.

The contention of the objectors that, by the inclusion of the word "railroad" in describing the proposed undertaking, the county exceeded the authority conferred by the act, in that the word "railroad" is nowhere used in describing the undertakings therein provided for, and that it is reasonably inferable that the General Assembly deliberately omitted the word "railroad" in connection with the word "terminals" because of the ownership of a railroad and terminal facilities by the State itself, is without merit. The very definition of the word "terminal" includes the idea of a railroad facility, and the definition of the term "railroad" as used in the Interstate Commerce Act includes "terminals" and "terminal facilities." 49 U. S. C. A. § 1 (3).

If the undertaking proposed by the county was a "terminal" such as above indicated, then it would be "specifically authorized and enumerated" by the act, but in the record before us such is not the case. It appears from the record, and from the testimony of the county commissioner, the one adopting the resolution authorizing the undertaking, that the proposed structure is to be located on the main line of a railroad and between two

highways; that it is to contain two million square feet of storage space; and it is to be provided with traveling cranes and hoists, fire-fighting equipment, hydraulic lift trucks, automobile trucks for inter-building transportation, and cold storage facilities. One of the purposes of the project will be to provide a place to receive goods which have been transported over a common carrier to the end of its destination, and to store such goods temporarily until delivered to the consignee, which would be the normal function of a terminal. However, as shown by the testimony of the county commissioner, the proposed undertaking is, in addition, to have warehouses which are to be leased to tenants of the county, who will hold permanent space in them for the storage of goods, wares, or merchandise, whether coming over the railroads or truck lines at that point or not. "Using General Electric as an example, they don't have any warehouse. They would ship in an immense quantiy of copper cables or any kind of devices that you use for switchboards. They would have no place to store it, and instead of depending on getting it every day when they need it, they would have it there and they would go get it as they need it. It could be their own warehouse." It is partly true that the revenues will come from individual tenants who will be renting permanent space in the building for the storage of goods, wares, and merchandise. Some will ship goods there for a day or two. They are to be charged to keep it. That would be the end of the terminal. Others will want to keep theirs there for six months, and have more coming in. It has not been estimated how much would be transitory and how much space would be used for permanent tenants.

It appears from other testimony in the record that the total terminal space occupied by all of the railroads, the carloading or forwarding companies, and all of the motor carriers serving the Atlanta area, consists of 548,912 square feet, while the structures proposed by the county here contain a total of 2,000,000 square feet. It thus appears that the undertaking here proposed is not a "terminal" within the meaning of that word as used in the statute, but that what the county proposes to do is to go in the general warehouse and storage business, which is ordinarily carried on by private enterprise, and in which the governmental subdivisions are not authorized to engage. 37 Am. Jur. 746,

§ 132. This court has recognized that the temporary storage of goods by a carrier while the goods are in transit or pending delivery to the consignee is a wholly different business from conducting a storage warehouse. *Town of Arlington* v. *Central of Ga. Ry. Co.*, 127 *Ga.* 721, 725 (56 S. E. 1015). That the General Assembly did not intend to confer authority upon the various governmental subdivisions to engage in the general storage warehouse business is evidenced by the fact that all of the undertakings "specifically authorized and enumerated" in the Revenue Certificate Acts deal with (1) ways, means and facilities for transportation; (2) public health; (3) public education; and (4) public recreation—all of which have been universally recognized as functions of government; and the evident purpose of the Constitution of 1945 was to limit and restrict governmental subdivisions in this type of financing to those types of governmental activities. There is conferred upon the governmental subdivisions the right to exercise the power of eminent domain in acquiring the necessary properties for the carrying out of the undertakings authorized, and always the power of eminent domain is to be exercised only for the benefit of the public generally, or for public use, and not for private purposes. *Housing Authority of the City of Atlanta* v. *Johnson*, 209 *Ga.* 560 (74 S. E. 2d 891).

The Supreme Court of Massachusetts, in the case of Re Opinion of Justices, 27 L. R. A. (N.S.) 483 (204 Mass. 607, 91 N. E. 405), holds: "The legislature cannot authorize a municipal corporation to secure by the power of eminent domain, or use the public funds to pay for, land abutting on a public street, to be leased to merchants for the promotion of the commercial interests of the municipality." The fact that the storage warehouse would contribute to the economic welfare and to the development of the business and commerce of the county is not sufficient to authorize the undertaking, for in Lowell *v.* Boston, 111 Mass. 454, 461 (15 Am. Rep. 39), it is said: "The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object. However certain and great the resulting good to the general public, it does not, by reason of its comparative importance, cease to be incidental. The incidental advantage to the public,

or to the State, which results from the promotion of private interests, and the prosperity of private enterprises or business, does not justify their aid by the use of public money raised by taxation, or for which taxation may become necessary. It is the essential character of the direct object of the expenditure which must determine its validity, as justifying a tax, and not the magnitude of the interests to be affected, nor the degree to which the general advantage of the community, and thus the public welfare, may be ultimately benefited by their promotion." It is true that the court there was speaking of public funds arising from taxation, but the fact that the funds proposed to be used here are to be derived from the sale of revenue-anticipation certificates does not deprive the funds of the character of "public funds," use of which for private purpose or enterprise is prohibited. See 35 Words and Phrases (Perm. ed.) 101, and numerous cases there cited; Code, Ann., Ch. 89-8.

What was said in State v. Kelly, 71 Kan. 811, 829, 836 (81 Pac. 450, 70 L. R. A. 450), as to the constitution of that State, might with equal force be said of article VII, section VII, paragraph V of our Constitution of 1945 (Code, Ann., § 2-6005). It was there said: "This constitutional provision is a limitation placed by the people in their paramount law upon the power of the legislature, preventing it from diverting the energies of the State from public and governmental functions into private and business enterprises. No circumstances can arise which will justify its violation by any governmental department. . . This is the first time that it has become necessary to invoke the aid of this provision of the Constitution to protect the State in its sovereign capacity from the public disaster that history shows would follow its engaging in a purely private business enterprise. It has been the policy of our government to exalt the individual rather than the State, and this has contributed more largely to our rapid national development than any other single cause. Our Constitution was framed, and our laws enacted, with the idea of protecting, encouraging, and developing individual enterprise, and if we now intend to reverse this policy, and to enter the State as a competitor against the individual in all lines of trade and commerce, we must amend our Constitution and adopt an entirely different system of government." See also numerous cases cited in the extensive annotations in 14 A. L. R. 1151.

It is true, as pointed out in the editorial note in 115 A. L. R. 1459, and in some of the cases cited in that annotation, that the courts of some jurisdictions in more recent times indicate a tendency to narrow the scope of the term "private business" and to broaden the scope of activities involving a "public purpose" in which a State or its political subdivisions may lawfully engage; but even those courts uphold the rule that neither a State nor its political subdivisions may be authorized to engage in a concededly private business. We adhere to the concept of free enterprise entertained by our forefathers and to the doctrine that the government should not engage therein. This government was founded upon the idea of free enterprise, and under it has become the strongest nation of the world in the comparatively short time of its existence, and it seems to us that governmental control and supervision of and participation in free enterprise under strained or liberal construction and application of social and economic ideology has gone far enough, if not too far, and should not be further extended.

It follows from what has been said that the trial court erred in validating the revenue certificates here involved, and that the Court of Appeals erred in holding that the trial judge was authorized to find from the evidence that the purpose to which the proposed undertaking is to be put is that contemplated by the General Assembly in the act of 1937 as amended, and in no way offends the constitutional provision of Code (Ann.) § 2-6005 as applied to the facts of this case.

The ruling here made being controlling, other questions raised will not be decided.

*Judgment reversed. All the Justices concur.*