42499. DEPARTMENT OF TRANSPORTATION v. CITY OF ATLANTA et al.
42673. DEPARTMENT OF TRANSPORTATION v. DAVIS et al.
42674. ARAPAHO CONSTRUCTION, INC. v. DAVIS et al.
42675. CITY OF ATLANTA v. DAVIS et al.
(337 SE2d 327)

SMITH, Justice.

These cases arise from actions taken by the State Department of

Transportation (DOT) and the City of Atlanta (the city) pursuant to our decision voiding a land transfer from the city to the DOT in *Dept. of Transp. v. Brooks*, 254 Ga. 303 (328 SE2d 705) (1985). In case no. 42499, the DOT seeks to overturn the DeKalb County Superior Court's dismissal of a condemnation petition involving interests retained by the city in four parks in Atlanta, DeKalb County. In case nos. 42673, 42674, and 42675, the DOT, the city, and Arapaho Construction, Inc., seek to overturn the same court's permanent injunction barring any further construction on any portion of the Presidential Parkway. We affirm case no. 42499. We affirm in part and reverse in part case nos. 42673, 42674, and 42675.

The Presidential Parkway is a proposed limited access highway designed to carry traffic between the downtown connector near its intersection with International Boulevard, and Ponce de Leon Avenue east of Moreland Avenue. Some of the recent, tangled history of the Parkway may be found in *Brooks*, supra. The Parkway, as planned, is meant to traverse portions of four parks owned by the city and located in DeKalb County: Candler Park, Shadyside Park, Goldsboro Park, and Dellwood Park.

Construction of the Parkway began in December 1984. In February 1985, after a hearing in *Brooks*, the Fulton County Superior Court issued an injunction barring some construction on the Parkway. *Brooks* was decided on April 23, 1985. In *Brooks*, we held that a deed transferring portions of these four parks from the city to the DOT was void because of "the very existence of the conflict of interest." 254 Ga. at 317.

On May 20, 1985, the Atlanta City Council passed an ordinance, which was signed into law on June 3, 1985, authorizing a second transfer of portions of the four parks in controversy to the DOT. This ordinance, unlike the ordinance involved in *Brooks*, imposed a number of restrictions on the transfer. The text of the new deed conditioned the transfer upon the maintenance of a thirty-five mile per hour speed limit on the Parkway, a ban on "trucks and heavy vehicles" on the Parkway, and a bar against the widening of Ponce de Leon Avenue east of Moreland Avenue. The deed also contained a possibility of reverter to be triggered by any violation of these conditions.

On June 6, the DOT accepted the deed after objecting to the conditions and the possibility of reverter. That same day, Mayor Young and Commissioner Moreland of the DOT executed an agreement which stated that the DOT reserved the right to condemn certain property interests, primarily the possibility of reverter, which were reserved in the deed. On June 7, the DOT filed a petition in the DeKalb County Superior Court seeking to condemn the possibility of reverter and any other interest that the city might have retained in

the portions of the parks deeded to the DOT. The DOT paid $1.00 into the court as just and adequate compensation for the property interests condemned.

On June 10, appellees Davis, Schulman, Brady, and Ratel (the intervenors) moved to intervene. On July 1, the trial judge granted the motion to intervene and dismissed the condemnation petition. The trial court ruled that the description of the property interests to be condemned was insufficient, and that the DOT, in any event, could not condemn municipal property under the procedure it sought to use.

On July 2, Davis and Schulman, appellees in both cases here, filed suit to void the land transfer from the city to the DOT and to enjoin any further construction on the Parkway. The trial court granted a temporary restraining order against any further construction in the parks on July 12. On September 4, the trial court issued an order voiding the land transfer and a permanent injunction against any further construction on any portion of the Parkway.

1. Appellants contend that some issues raised by the intervenors should be barred by res judicata, and that the intervenors should be prohibited from pursuing this suit under the doctrine of laches.

a. *Brooks*, supra, involved the validity of the Atlanta City Council's procedure in attempting to transfer land that it owned to the DOT, and the propriety of allowing a certain contractor to continue to work on the Parkway. We held that the contractor should be allowed to continue working on the Parkway, but that a conflict of interest on the part of the City Council President in presiding over council proceedings involving the transfer rendered the council's actions in transferring the land void. Here, the intervenors claim that a second, separate transfer of the same property violates state law and municipal ordinances, and that the state may not condemn any interest reserved by the city in the subject property.

The DOT, thus, does not contend that questions relating to the condemnation issue and the procedure followed by the city in this transfer are barred by res judicata. The DOT primarily asserts that the appellees' claims that the city does not have the authority to transfer the parklands, and that the dedication of the parks prevents their transfer, should be barred by res judicata. The question is thus reduced to whether the taxpayers' previous successful attempt to prevent the earlier land transfer will act as a bar to their subsequent attempt to prevent a *later* land transfer of the same land on grounds that could have been, but were not in fact, used to justify the earlier bar on the first transfer.

An issue involving the same piece of land will not be barred when it arises out of a second transaction. The intervenors will not receive, under this holding, a "second shot" at the transaction involved in

*Brooks.* A finding of res judicata would not prevent multiple lawsuits here. The city and the DOT may have violated the same "right" of the intervenors in this case that they did in *Brooks*, but they did so in a different transaction. See *Spence v. Erwin*, 200 Ga. 672 (38 SE2d 394) (1946). The trial court correctly found that res judicata does not bar any of this action.

b. As the intervenors filed a timely motion to intervene in case no. 42499, and filed the second suit almost immediately after the condemnation petition was denied, we find no laches here.

2. The land in the four parks in question was expressly dedicated to the city for use as parklands. The city accepted the dedication. There were no reversionary clauses in the deeds of dedication. As the record in this action shows, the parks have not been abandoned by the city or the public.

a. "Where a municipality dedicates property to a public use, it inures to the benefit of all who are at the time, or may afterwards become, citizens of the municipality, such dedication being in the nature of an estoppel in pais; and where an attempt is made by the proprietor to revoke it by a sale of the land, the municipality may be enjoined by any person interested. *Mayor &c. of Macon v. Franklin*, 12 Ga. 239 (5, 6). Where a municipality dedicates property to a public use, it may be put to all customary uses within the definition of the use. Any use which is inconsistent, or which substantially and materially interferes, with the use of the property for the particular purpose for which it was dedicated, will constitute a misuser or diversion. *Brown v. City of East Point*, 148 Ga. 85 (3) (95 SE 962)." *Norton v. City of Gainesville*, 211 Ga. 387, 389 (86 SE2d 234) (1955).

*Norton* involved an attempted lease of parklands to a private interest. The court enjoined the lease. This court clearly indicated, in the passage quoted above, that the justification for the injunction of the lease rested in the fact that the lease would constitute a change in the nature of the use of the property, *not* in the fact that the lease involved a private party. In fact, no sale or conveyance was involved in *Norton*. The *change* in *use* of dedicated parklands was the central factor mitigating in favor of the injunction.

*City Council of Augusta v. Newsome*, 211 Ga. 899 (89 SE2d 485) (1955), and *Harper v. City Council of Augusta*, 212 Ga. 605 (94 SE2d 690) (1956), show the process mandated by this court in cases where a city wishes to alienate land which has been dedicated to it as a park, and which has not been abandoned. In *Newsome*, this court barred the City Council from selling a park to Sears and Roebuck on the grounds that the city did not have the power " 'to convey or sell land dedicated as a public park square, or common.' " 211 Ga. 899. The council, in turn, sought and received authorization to hold a referendum on the issue from the legislature. The citizens approved the sale

in the referendum, and this court approved the process in *Harper*. *Harper* and *Newsome* reify the theory that in this matter, which so closely affects the citizens of a municipality, and upon which they possess sufficient expertise to make a decision, representative democracy should be reduced to its most elemental form — the undiluted voice of the people.

b. In promulgating OCGA § 36-37-6.1 (Ga. Laws 1982, p. 2107, § 40), the legislature recognized the state law exemplified by *Newsome*. OCGA § 36-37-6.1 grants municipalities having a population greater than 300,000 the authority to "sell, exchange, or otherwise dispose of any real or personal property" including parks and property used for other recreational purposes except where "authorizing alienation . . . would be in derogation of rights, duties, and obligations imposed by prior deed . . . or where such alienation would cause divesting of title to a park, playground, . . . or other like property that has been dedicated to public use and not subsequently abandoned." This statute gives large cities greater flexibility than OCGA § 36-37-6 does in dealing with their large holdings of municipal property, while preserving the interest of the public in recreational facilities so needed in urban areas. While this statute does not serve as an affirmative bar to the alienation of the parklands in question, it does incorporate the bar established in the conditions included in the deeds granting the parks to the city and the bar established by the dedication and the public's acceptance of the parks in question.[1]

c. OCGA § 32-3-3 (b) states, "Any state agency, county, or municipality is authorized, for public road purposes, to enter into agreements with other state agencies, counties, or municipalities, with the federal government, and with private persons for the exchange of real property or interests therein for public road purposes." The DOT, in its brief, "agrees [with the intervenors] that OCGA § 32-3-3 (b) could not authorize the City to transfer property which the City was otherwise prohibited by law from alienating." As shown above, at this point in time, the city may not legally alienate the parklands in question. If, through legislation or referendum, the city acquires the right to alienate the land in question, OCGA § 32-3-3 (b) will, as the DOT contends, provide specific statutory authorization for a property exchange rather than an auction or a sealed bid procedure. See generally *Beazley v. DeKalb County*, 210 Ga. 41 (1) (77 SE2d 740) (1953); *Kirkland v. Johnson*, 209 Ga. 824 (76 SE2d 396) (1953).

d. The DOT contends that the trial court erred in finding the

---

[1] For example, if the legislature should see fit to alter the effect of dedication upon a municipality, or to provide a method for a municipality, in certain instances, to avoid the effect of dedication, the framework of OCGA § 36-37-6.1 would not be affected, but its scope and import certainly would be.

land transfer here an ultra vires act by the City Council, and in ruling that certain municipal ordinances purportedly barring the transfer did not conflict with state law.

(i) "For [an] action to be considered ultra vires, it must appear that the action taken was beyond the scope of the powers that have been expressly or impliedly conferred on the municipality." *Newsome v. City of Union Point*, 249 Ga. 434, 437 (291 SE2d 712) (1982). Here, the city did not have the power to alienate the parklands in question for the reasons stated above. For this reason, the City Council's act in transferring the land *was* ultra vires and was properly enjoined as such.

We do not find, however, as the trial court did, that the transfer was an ultra vires act by reason of its conflict with certain city ordinances passed pursuant to a city charter provision. Atlanta City Charter § 6-403 requires the City Council to pass ordinances or resolutions providing for procedures to follow in "all sales and other dispositions of real and personal property by the City." Failure to follow procedures adopted pursuant to this charter provision constitutes an " 'irregularity in the exercise of the granted powers,' *Georgia Granite R. Co. v. Miller*, 144 Ga. 665 (2a) (87 SE 897) (1915)," *Newsome*, supra at 437, and thus does not constitute an ultra vires act. In addition, failure to provide procedures for an unauthorized action, such as the transfer of the land in question, could hardly be considered a violation of the city charter and an ultra vires act. The transfer was ultra vires due to the conflict with state law, rather than with the city charter or the city ordinances as the trial court ruled.

(ii) Atlanta Code of Ordinances § 5-5213 provides that the city may exchange "surplus real property" for other real property on a " 'square foot for square foot' or 'dollar value for value' " basis. Atlanta Code of Ordinances § 5-5224 states that the city must obtain "at least one (1) appraisal" to determine that in an exchange of property, the city receives equal value for value.

Code § 5-5213 does not, as the DOT contends, conflict with OCGA § 32-3-3 (b) which authorizes property exchanges between municipalities and state agencies. Code § 5-5213 simply does not provide a procedure for land transfers such as the one in question. We find no conflict.

As the failure of the City Council to comply with Code § 5-5224 would not result in an ultra vires action, see *Newsome*, supra, and a court of equity will not "restrain or control the discretionary powers of municipal officials" unless the officials act in a manner that is fraudulent, corrupt or ultra vires, *Brooks*, supra at 314, we find that the trial court should not have based the voiding of the transfer on the city council's failure to comply with Code § 5-5224. We thus need not reach the question of whether § 5-5224 conflicts with state law.

3. Appellants contend that the trial court erred in ruling that an agency of the state, here the DOT, does not possess the power or the authority to condemn land in current public use owned by a municipal corporation.

a. Initially, we note that the trial court correctly ruled that the Constitutional provision regarding the power of eminent domain, Art. I, Sec. III, Par. I, only relates by its own terms to private property. That clause serves to ratify the limitation placed upon the state's inherent right of eminent domain by the individual citizens' right to own property. See Nichols on Eminent Domain, § 1.11 (3d ed.) No need for such a clause relating to municipal property exists, however, because municipal corporations, as creatures of the state do not possess any *Constitutional* right to own property, which creates the tension with the state's right to eminent domain which, in turn, creates the need for Art. I, Sec. III, Par. I.

Cities exist by the grace of the state through special acts of the General Assembly. As a municipal corporation's right even to own property may be limited in the special act creating that city, see *Kirkland v. Johnson,* 209 Ga., supra, the state certainly possesses the inherent power to limit those property rights through condemnation. A city is not, however, in total thrall to the General Assembly, much less a state agency such as the DOT, by nature of its creation. When the General Assembly creates a city, it limits the state's power within the sphere of that municipality. It carves out an area in which the state may not, by fiat, operate in any manner in which it pleases.

The General Assembly may not, for example, pass laws that affect a municipal corporation in a manner "inconsistent with [the Georgia] Constitution, [or] repugnant to the Constitution of the United States." Georgia Constitution, Art. III, Sec. VI, Par. I. This constitutional provision also states that the General Assembly "shall have the power to make all laws . . . which it shall deem necessary and proper for the welfare of the state." Just as the General Assembly is limited in its conduct relative to municipal corporations by Art. III, Sec. VI, Par. I, so is the DOT limited in its conduct relating to municipal corporations by laws passed by the General Assembly pursuant to Art. III, Sec. VI, Par. I.

Among the laws that the General Assembly has passed pursuant to Art. III, Sec. VI, Par. I, are the laws authorizing the DOT to condemn land. A reading of those statutes authorizing the DOT to condemn land will reveal the extent to which, and the manner in which, the legislature has allowed the DOT to manifest its power of eminent domain relative to a municipal corporation.

b. First, we look to Title 32 of the Georgia Code to examine the procedure that the legislature has set out exclusively for land acquisition for transportation purposes. OCGA § 32-2-2 (a) (8) grants the

DOT "the authority to exercise the right and power of eminent domain and to purchase, exchange, sell, lease, or otherwise acquire or dispose of any property or any rights or interests therein for public road purposes. . . subject to such express limitations as are provided by law." This simply restates the proposition that the DOT's power and authority to condemn property is subject to statutory limitations.[2]

Reading further in Title 32, OCGA § 32-3-1 (a) states, "Any property may be acquired in fee simple or in any lesser interests, including scenic easements, air space, and rights of access, by a state agency or a county or municipality through gift; devise, exchange, purchase, prescription, dedication, eminent domain, or any other manner provided by law for present or future public road or other transportation purposes." OCGA § 32-3-2 then states, "All acquisition of property or interests for public road purposes shall proceed under the methods set out in this article and in Title 22." OCGA § 32-3-3 authorizes the DOT, counties, and municipalities to acquire "any property" by "devise, exchange, prescription, or dedication." In these statutes, the legislature declares that the DOT may *acquire* "any property" for road purposes only through the lawfully established procedures set out in Title 32 and in Title 22.[3]

The procedure that the DOT wishes to use in this case is introduced in OCGA § 32-3-4, which is entitled "*Authority* to bring condemnation proceedings." (Emphasis supplied.) OCGA § 32-3-4 states, "Whenever any state agency, county, or municipality desires to take or damage private property . . . for public road purposes . . . such state agency, county, or municipality . . . may file [a condemnation petition] in the [appropriate] superior court." This represents the first time that the term "private property" appears in Title 32 regarding matters relating to condemnation.

OCGA § 22-1-3 states, "It is the province of the General Assembly to determine when the right of eminent domain may be exercised." In *Chestatee Pyrites Co. v. Cavenders Creek Gold Mining Co.*, 119 Ga. 354, 355 (46 SE 422) (1903), this court held, "[t]he right of eminent domain . . . lies dormant until the legislature sets it in motion. As the legislature can not in every case supervise the condemnation, it may confer the power upon agencies . . . [t]he power thus conferred is *always* to be strictly construed, and will not be permitted to be exercised except where it is affirmatively granted." (Emphasis

---

[2] The clauses beginning with "to exercise" and "to purchase" are certainly independent of each other. For example, one exercises eminent domain *over*, not *of*, property. "Eminent domain," thus, does not relate to the later occurring phrase, "any property."

[3] The fact that the DOT may *acquire* any property does not mean that the DOT may *condemn* any property.

supplied.) This court later, in *State Hwy. Dept. v. Hatcher*, 218 Ga. 299, 302 (127 SE2d 803) (1962), noted "the general rule in this country that statutes conferring the power of eminent domain must be strictly construed, and clear legislative *authority* must be shown to authorize the taking." (Emphasis supplied.) Delegations of the authority to exercise the right of eminent domain, thus, must be strictly construed in Georgia.

In addition, we held in *Dorsey v. Dept. of Transp.*, 248 Ga. 34, 37 (279 SE2d 707) (1981), that while the procedure for condemnation under OCGA § 32-3-2 et seq. does not violate due process, "the statute must be strictly conformed to by the condemning body." In *Frank v. City of Atlanta*, 72 Ga. 428, 432 (2) (1884), we held, "[t]he taking or injuring of private property for the public benefit is the exercise of a high power, and all the conditions and limitations provided by law, under which it may be done, should be closely followed. Too much caution in this respect cannot be observed to prevent abuse and oppression." Condemnation procedures thus must be strictly construed as well.

OCGA § 32-3-4 constitutes a delegation of authority to follow a specific condemnation procedure. As such, under the authority quoted above, we must construe the statute strictly against the condemning authority. We thus find that the term "private property" found in OCGA § 32-3-4 does not include property owned by a government or a governmental entity.

A number of other factors support this construction. First, Black's Law Dictionary (5th ed.) defines "private" as "affecting or belonging to private individuals, as distinct from the public generally." Our construction follows the plain meaning of "private property."[4] Next, OCGA § 32-3-4 marks the first appearance of the term "private property" in Title 32. After repeated references to "property," or "any property," we cannot ignore the legislature's specific use of the adjective "private" for the first time. Finally, "private property" under this statute is subject to condemnation by "any state agency, county, or municipality." We find no sense in a construction that finds a specific piece of property "private" when "any state agency" attempts to condemn it, and "public" when a "county or municipality" attempts to condemn it, as would be necessary under the DOT's proposed construction.

The DOT cites *United States v. 50 Acres of Land*, 53 USLW 4001 (decided December 4, 1984), for the proposition that "private property" includes land owned by a municipal government for the

---

[4] Note that this construction also follows the meaning of "public" and "private" in conjunction with "road" according to the "Definitions" section of Title 32. OCGA § 32-1-3 (21), (24).

purposes of eminent domain. While that proposition seems plausible at first blush, we find that such a reading exalts the rule of the case above the reasoning behind the rule. As we are construing the same phrase in an entirely different context,[5] we find the reasoning behind the ruling much more valuable than the black-letter law.

The United States Supreme Court, in *50 Acres*, supra at 4003, held, "When the United States condemns a local public facility the loss to the public entity, to the persons served by it, and to local taxpayers may be no less acute than the loss in a taking of private property." The court then held that "private property" for the purposes of the Takings Clause of the Fifth Amendment, included state and municipal property. The court, in effect, reasoned that the public interest in public property is as important as a private individual's interest in private property for the purpose of construing language involved in eminent domain proceedings. Pursuant to this reasoning, the court construed the language in question against the condemning authority in a case where public interests were subject to condemnation proceedings. The substance, if not the form, of *50 Acres* thus supports the use of strict construction against a condemning authority where public interests are the subject of eminent domain proceedings.

Following this construction, and the plain meaning of OCGA § 32-3-4, we find no specific authorization for the DOT to use the condemnation procedure set out in OCGA § 32-3-5 et seq. in an action against public, municipal property.[6]

c. The appellants cite *Elberton Southern R. Co. v. State Hwy. Dept.*, 211 Ga. 838 (89 SE2d 645) (1955), and *Southern R. Co. v. State Hwy. Dept.*, 219 Ga. 435 (134 SE2d 12) (1963) for the proposition that the DOT may condemn the land in question because the land in question is devoted to a public use. As the nature of the ownership of the land in question, not its use, controls this case, these cases are inapplicable here.

OCGA § 32-3-4 authorizes the taking of "private property." Railroad property is generally owned by stockholders, not taxpayers. Such property may be devoted to public use but nevertheless remain private property. A railroad right of way is simply private property to which the public has a right of use. Even when put to a public use,

---

[5] The relationship between the federal government and a state or a city is certainly different from the relationship between a state and a city. In addition, a certain definition of "private" will obviously create different consequences when used in the Fifth Amendment to the United States Constitution and in our statutes. This is why understanding transcends knowledge in value as far as *50 Acres* is concerned.

[6] Compare our condemnation statutes with the statute cited in *Hiland v. Ives*, 154 Conn. 683 (228 A2d 502, 35 ALR3d 1283) (1967). Connecticut provides detailed, explicit procedures for the condemnation of land "which is restricted to conservation or recreation use" for transportation purposes. Conn. General Statutes § 7-131j (Rev. to 1966).

railroad property is primarily purchased and owned for the fundamental purpose of generating profit for the railroad.

Municipal land, on the other hand, is in *all* respects public property. While OCGA § 32-3-4 might authorize the taking of private property put to a public use, public property, as seen above, is an entirely different species. Since railroad property is private property, not public property, we find *Elberton Southern,* supra, and *Southern Railway,* supra, to be inapplicable.

These two cases, in addition, were based upon 1933 Code of Ga. § 95-1724, which stated, "The State Highway Board, acting for and in behalf of the State, is hereby authorized and empowered to exercise the right of eminent domain in the condemnation of rights of way and property thereon for the use of the system of State highways . . . ." We need not attempt to interpret this statute because: a) The language of the statute differs considerably from the language of the statutes involved in this case; b) The cases arising from this statute, as stated above, do not relate to the fact situation in the present case, and, most importantly; c) Code § 95-1724 was repealed along with all of former Ga. Code Ann. Title 95 by Ga. L. 1973, p. 947. *Elberton Southern Railway,* supra, *Southern Railway,* supra, and Code § 95-1724 do not relate to, much less control, this case.

d. OCGA § 22-2-102, which provides for condemnation proceedings before a special master, and OCGA § 22-2-130, which provides authority for condemnation proceedings before the superior court also state that they are available "for the taking or damaging of private property" (OCGA § 22-2-102), or where the condemnor "desires to take or damage private property." (OCGA § 22-2-130.) We find our construction of OCGA § 32-3-4 applicable to these statutes, and thus find that the DOT may not condemn municipal property under OCGA § 22-2-102 or OCGA § 22-2-130.

e. In *Young v. McKenzie,* 3 Ga. 31 (1847), this court addressed an act of the legislature which incorporated a company for bridge building, and which provided the company with the authority to condemn property and with a procedure by which it might condemn property if necessary. The court held that the act was an expression by the state of the power of eminent domain, and that the right to delegate such power rested in the legislature. The court held the act constitutional.

The 1863 Code of Georgia contained three general statutes dealing with eminent domain. Code § 2201 (now OCGA § 22-1-2) defined the power of eminent domain, and also stated that "in time of peace the General Assembly may authorize the appropriation [any part of the territory of the state] to public purposes." Code § 2202 (now OCGA § 22-1-2) codified the ruling in *Young,* supra, that the power to delegate the authority to condemn property rested in the General Assembly. Code § 2203 (now OCGA § 22-1-4) stated that the General

Assembly could "exercise the right of eminent domain" through state officers, corporations, or through "means of individual enterprise." Code § 2204 (now OCGA § 22-1-5) stated that compensation was to be paid the condemnee before the property was taken except in extreme emergencies. The legislature did not set out any specific procedure for condemnors to follow in the 1863 Code.

In 1894, the legislature enacted a law entitled "Condemnation of Private Property" (Ga. L. 1894, p. 94) and which subsequently appeared in the 1895 Code of Georgia § 4657 et seq. Code § 4657, the initial section in the law, stated, "All corporations or persons authorized to take or damage private property for public purposes shall proceed as herein set forth." This statute now appears as OCGA § 22-1-8, except that "corporations" has been deleted, and "as herein set forth" now reads "as set forth in this title." Code § 4660 stated, "The corporation or person seeking to condemn property for public purposes shall serve a notice upon the owner of the property . . ." This statute, with "All corporations or persons" changed to "Any person," now appears at OCGA § 22-2-20.

"Property" in OCGA § 22-2-20, thus, was originally limited to "private property" by the title of the law which included the original statute, and by original code § 4657. (OCGA § 22-1-8.) As the intervenors point out, these statutes — the general statutes and the procedural ones — remained separately grouped until the latest revision of the code in 1982. Now, former code § 4657 (OCGA § 22-1-8) has been removed from the chapter authorizing the procedure before assessors to the general chapter, Title 22, Chapter 1. Former code § 4660 (OCGA § 22-2-20) remained in the chapter authorizing the procedure.

This change in position of these two code sections did not change their relationship. First, the plain meaning of OCGA § 22-1-8 authorizes only condemnation of private property pursuant to Title 22. Next, "[e]xcept as otherwise provided by [the 1983 code], the enactment of [the 1983 code] is not intended to alter the substantive law in existence on the effective date of this code." OCGA § 1-1-2. "Property" is still limited to "private property" for the purposes of OCGA § 22-2-20.

f. While the DOT, as an agency of the state, may upon authorization serve as a conduit for the state's inherent power to exercise eminent domain over municipal property, the legislature has not clearly given the DOT the authority or the procedure by which the DOT might condemn municipal land. If our interpretation of the original legislative intent or our construction of the statutes in question differ from the intent of the present legislature, that body, as the law-making branch of the government, may enact such laws as it sees fit to effectuate that intent.

4. The DOT contends that the city may not withdraw its consent

for construction of the Parkway.

OCGA § 32-6-111 (a) states that limited access roads may be planned, built, and maintained in municipalities, "provided, further, that within such municipalities such authorization shall be subject to such municipal consent as may be provided by law." The statute authorizes "the department [of transportation] or a county or a municipality in this state [to act] alone or in cooperation with each other. . ." to follow through with such a road. Here, the "Campbell Resolution" and the ordinance authorizing the land transfer constitute "municipal consent" as well as "cooperation" between the city and the DOT. The DOT's reliance upon such consent, in moving forward with *construction* on the Parkway, estops the city from revoking its consent to the *construction* of the Parkway. As for regulation and maintenance of the Parkway, the DOT and the city may "cooperate" and otherwise act as they see fit pursuant to this opinion and any other relevant state law.

5. The DOT contends that the conditions upon which the city based its possibility of reverter are void, since they purport to restrict the state's power of eminent domain. They argue that the conditions are thus contrary to public policy, and as a result are void under OCGA § 44-6-43.

As seen above, the *state* possesses the power of eminent domain over the city's property. We do not, however, read the conditions as attempts to limit the state's power of eminent domain. Upon authorization, in fact, the DOT may condemn municipal property interests, as was discussed above. Since the possibility of reverter gives meaning to the conditions, we find no conflict between the conditions and the DOT's power of eminent domain. In any event, our vacation of the land transfer renders the question moot.

6. The trial court granted a permanent injunction against any further construction on the Parkway largely on the basis of its conclusion that, as a constitutional matter, the DOT could never condemn any of the city's interest in the parklands.

We find no such constitutional barrier. The General Assembly may certainly provide the DOT with the authority and the procedure to condemn any municipal property, or this municipal property alone. The General Assembly may also grant the city the authority to hold a referendum or follow any other procedure the General Assembly finds proper, to effectuate the land swap. Keeping these guidelines in mind, we lift the trial court's injunction of construction on land not included in the parklands in controversy. The DOT, thus, may proceed as it desires at its peril, as the equities will be balanced in the future as of the date of the trial court's initial injunction in this case.

7. Under OCGA § 32-3-17, taxpayers possess the right to intervene in condemnation actions against land owned by the entity to

which they pay their taxes. In other words, the public possesses "an interest" in public property.

8. We do not reach the issue of the DOT's description of the possibility of reverter in its condemnation petition, since our holding relative to the DOT's authority under OCGA § 32-3-4 will support the trial court's dismissal of the condemnation petition.

9. We need not reach the DOT's complaint that it was denied the right to full discovery by the trial court, as our holding on the res judicata effect of previous suits involving the Parkway did not rest upon lack of identity of the parties.

10. In addition, we need not determine the sufficiency or insufficiency of the description of the property interest condemned by the DOT, as we have decided that the condemnation procedure that the DOT operated under was not available to the DOT.

*Judgment affirmed in Case No. 42499. Judgment affirmed in part and reversed in part in Case Nos. 42673, 42674, and 42675. All the Justices concur, except Hill, C. J., Marshall, P. J., and Weltner, J., who dissent.*

CLARKE, Justice, concurring.

I concur in the judgment of the majority. In my opinion, the eminent domain issue is in the last analysis simply a question of statutory construction. Our duty is no more than an interpretation of the phrase "private property."

It has been said that there are four methods of judicial interpretation of statutes: the literal method, the golden rule method, the sound law approach, and the standard old rule method. The literal method simply dictates that we not depart from the plain meaning of the language of the statute. The golden rule method would direct that we follow the literal method unless it produces contradiction, absurdity or such an inconvenience as to insure that the legislature meant something else. The sound law approach is for the appellate court to make sense out of the statute but to be faithful to the legislative intent. Under this method, consideration should be given to the purpose of the statute in trying to make it at home with the whole body of the law. The standard old rule method is sometimes called the "mischief rule." Here the appellate court seeks to find the law as it existed before the statute was passed and then identify the mischief sought to be corrected, the idea being that this would lead to the legislative intent and would protect the law as a seamless web.

I have attempted to apply each of these methods to the statute in question here. In doing so I am unable to reach the conclusion that the words "private property" mean lands owned by municipal corporations.

HILL, Chief Justice, dissenting.

The majority acknowledges that the DOT has been granted the power to condemn "any property," OCGA § 32-3-1 (a), see also OCGA § 32-2-2 (a) (8), supra, including public property. However, the majority finds that the General Assembly has provided the DOT with procedures to condemn only "private property," not public property. OCGA § 32-3-4; see also OCGA §§ 22-2-102, 22-2-130, supra. Why would the General Assembly grant the power to condemn public property but withhold the procedures to do so? I find that the procedure has been provided, as well.

As the majority points out, the General Assembly provided the procedure for condemning private property for public road purposes in OCGA § 32-3-4, supra, as follows: "Whenever any state agency, county, or municipality desires to take or damage private property . . . for public road purposes . . . such state agency, county, or municipality . . . may file a proceeding in rem . . . condemning the property . . . ." The Code sections which follow provide for the contents of the condemnation petition, the contents of the declaration of taking, the deposit of estimated compensation, and service of process. OCGA §§ 32-3-5 through 32-3-8. This is known as the "declaration of taking" procedure.

As for limited access highways, which this is, in OCGA § 32-6-112 the General Assembly provided DOT the procedure to condemn public property for such highways "in the same manner" as authorized by law for "public roads," saying: "The department, a county, or a municipality may acquire private or public property and property rights for limited-access facilities and service roads . . . through gift, devise, purchase, or condemnation in the same manner as such governmental units are authorized by law to acquire such property or property rights in connection with public roads within their respective jurisdictions."

The "same manner" refers, at least, to the "declaration of taking" procedure provided by OCGA § 32-3-4 et seq., supra.[1] The majority's construction of OCGA § 32-6-112, supra, is that the General

---

[1] *State Hwy. Dept. v. Hatcher*, 218 Ga. 299 (127 SE2d 803) (1962), is inapplicable here. In that case the Highway Department sought to use the 1961 declaration of taking procedure applicable to "state aid roads" to condemn private property for a "limited access [interstate] highway" as authorized by a 1955 act (now OCGA § 32-6-112). The court held that the 1961 declaration of taking procedure could not be so used because the 1961 act had been expressly amended to limit its application to "state aid roads," thereby precluding reliance on the 1955 "limited access highway" act. The following year, the General Assembly provided that interstate highways are state aid roads, Ga. L. 1963, p. 280, and in 1973 the reference to "state aid roads" was deleted from what is now OCGA § 32-3-4, Ga. L. 1973, p. 947, § 95A-603, so that the declaration of taking procedure became applicable to all public roads. This legislative history shows that it was the intent of the General Assembly to allow DOT to condemn property for limited access highways, OCGA § 32-6-112, by use of the declaration of taking

Assembly accomplished nothing by including the words "public property" in that Code section. That is contrary to the rules of statutory construction.

In *Butterworth v. Butterworth*, 227 Ga. 301, 304 (180 SE2d 549) (1971), the court reviewed the rules of statutory construction and said, in pertinent part: " 'The rule of construction that effect is to be given to all the words of a statute, forbids that two provisos should be treated as having no more scope or significance than one of them would have if standing alone. It is better to wait for legislative amendment than to arbitrarily reject one of the provisos as senseless or superfluous.' *Smith v. Davis*, 85 Ga. 625 (2) (11 SE 1024). '[A]ll the words of the legislature, however numerous, ought to be preserved, and effect given to the whole, if it can be done. No doubt courts could sometimes better legislation by rejecting some of the words delivered to them by the legislature for construction; but *to do this courts have no power*.' (Emphasis supplied.) *Smith v. Davis*, supra, p. 631."

Because the majority refuse to give any effect to the words "public property" in OCGA § 32-6-112, I dissent to Division 3 (b) of the majority opinion, including what is said on motion for reconsideration.

I am authorized to state that Presiding Justice Marshall and Justice Weltner join in this dissent.

WELTNER, Justice, dissenting.

I dissent to those portions of the majority opinion which affirm the trial court.

1. OCGA § 32-3-1 (a) provides: "*Any property* may be acquired in fee simple or in any lesser interest, including scenic easements, airspace, and rights of access, by a state agency . . . through . . . eminent domain . . . for present or future public road or other transportation purposes." (Emphasis supplied.)

2. In 1955, we held that what was then known as the State Highway Department "has paramount authority in the matter of taking any property within its boundaries for those public uses to which it may reasonably devote such property, *including that which has already been devoted to a different public use*." (Emphasis supplied.) *Elberton Southern R. Co. v. State Hwy. Dept. of Ga.*, 211 Ga. 838, 839 (89 SE2d 645) (1955).

3. In 1963, we drew a distinction between inherent powers of eminent domain, such as belong to a state by virtue of its sovereignty, and delegated powers of eminent domain which are conferred upon a lesser entity (either a public body, or a privately-owned enterprise

procedure provided by OCGA § 32-3-4.

which is affected by a public interest)· through legislative grant. "But a rule different from the one stated above prevails where one is exercising a *delegated* power of eminent domain. There, the one exercising such a delegated power of eminent domain may not condemn property already devoted to another and different public use unless power to do so is conferred upon it in express terms *or by necessary implication*." (Emphasis supplied.) *Southern R. Co. v. State Hwy. Dept.*, 219 Ga. 435, 439 (134 SE2d 12) (1963).

4. Having conferred upon the Department of Transportation the power to acquire by eminent domain "any property," and having determined, in the cases noted above, that property devoted to a public use is *not* beyond the reach of the state's power of eminent domain, and having distinguished between the inherent power of the sovereign and the conferred powers of lesser bodies, the issue resolves itself into this: is there, by necessary implication, the power within the state's executive branch to acquire property now devoted to some public use?

5. The answer to that question must be in the affirmative, upon several considerations:

(a) Whether property which is devoted to a public use is vested in a public or a private corporation is immaterial, as both receive their powers of eminent domain by legislative grant. To attempt to distinguish those cases noted in the first paragraph above on the ground that they treat public utilities is unavailing, as it must be the nature of *use* and not *title* that counts. Private property may only be condemned for public purposes. If private property be taken for other than public purposes — by whatever entity — what occurs then is not the exercise of the power of eminent domain, but expropriation. "We have repeatedly held that private property may not be taken for a private purpose . . ." *Earth Management, Inc. v. Heard County*, 248 Ga. 442, 446 (283 SE2d 455) (1981).

(b) The cases of *Dorsey v. Dept. of Transp.*, supra, and *Frank v. City of Atlanta*, supra, cannot be relied upon as calling for a strict construction of the *power* of eminent domain, as vested in the sovereign. They merely apply the elementary proposition that condemnation procedures as established by the General Assembly "must be strictly conformed to by the condemning body." *Dorsey*, supra, 248 Ga. at 37.

(c) The declaration in OCGA § 32-3-1 that "[a]ny property may be acquired . . . by a state agency . . . through . . . eminent domain . . . for present or future public road or other transportation purposes" must be understood to include the authority of the Department of Transportation to condemn property subjected to a public use, whatever the status of its title may be. See Annot. 35 ALR3d 1293, 1312.

(d) Having lodged the condemning power in the Department of Transportation, and having charged it with the transportation needs of a state of five and a half million people, it is fatuous to suggest that the discharge of these responsibilities is to be frustrated by the absence, in the statute, of the specific words "public property."

The necessary consequence of such a holding quickly can lead to the absurd. Assume these circumstances: the Department plans a major interstate route through a portion of a small hamlet in Georgia; the city fathers want none of it; they cause to be condemned a yard-wide strip lying directly athwart the path of the proposed interstate highway. Thus ends the interstate highway project — permanently.

Such a rule is more appropriate to a game of Parcheesi than to the operation of a department of government.

I am authorized to state that Presiding Justice Marshall joins in this dissent.

ON MOTION FOR RECONSIDERATION.

The DOT cites OCGA § 32-6-112 as authority for the condemnation of the parks involved in this case. OCGA § 32-6-112 enables the DOT to acquire property for limited access roads in the same manner that it may acquire property for other roads. OCGA § 32-6-112 states, "The department, a county, or a municipality may acquire private or public property and property rights for limited-access facilities and service roads, including rights of access, of view, of air, and of light through gift, devise, purchase, or condemnation in the *same* manner as such governmental units are authorized by law to acquire *such* property or property rights in connection with public roads within their respective jurisdictions." (Emphasis supplied.)

This code section does not state that the DOT may acquire public property through *any* manner that it is authorized to otherwise use to acquire *any* property. As the DOT is nowhere otherwise authorized to employ eminent domain to acquire public property, "the same manner" does not include condemnation where public property is concerned. In other words, since "the department . . . may acquire . . . public property . . . through . . . condemnation in the same manner that [it] is authorized by law to acquire such [i.e., public] property . . . ," and the department is not anywhere authorized by law to condemn public property, this code section gives the department no authority to condemn public property that it otherwise could not condemn.

"Public property" simply does not, as the DOT contends, apply by necessity to each of the four methods of property acquisition listed in OCGA § 32-6-112. A city, for example, may not "devise" public property to the DOT even though the DOT may be "authorized by

law" to acquire private property from private individuals through devise. The DOT is not "authorized by law" to acquire public property by devise or by condemnation.

Furthermore, as noted previously in Division 4, OCGA § 32-6-111 (a) provides that authorization to "plan, designate, establish, regulate, abandon, alter, improve, maintain, and provide" limited access facilities within municipalities "shall be subject to such municipal consent as may be provided by law." This statute applies to limited access facilities that lie within municipalities, not just limited access facilities upon municipal property. The DOT's reading of OCGA § 32-6-112 conflicts with OCGA § 32-6-111 (a), in that Code § 32-6-111 (a) requires municipal consent, and Code § 32-6-112 would, in the next breath, enable the DOT to render that requirement useless. Gift, devise or purchase transferring municipal land to the DOT would, by definition, be premised on municipal consent. Condemnation of municipal property by the DOT would, except in very rare instances, occur in the absence of municipal consent. "[A]ll the words of the legislature, however numerous, ought to be preserved, and effect given to the whole, if it can be done. No doubt courts could sometimes better legislation by rejecting some of the words delivered to them by the legislature for construction; but to do this courts have no power." *Smith v. Davis*, 85 Ga. 625, 631 (11 SE 1024) (1890). OCGA § 32-6-111 (a) not only distinguishes condemnation from other methods of property acquisition under OCGA § 32-6-112, it also supports the appellee's position that the legislature did not intend to expand the DOT's power and authorize condemnation of public property in enacting OCGA § 32-6-112.

Since the power of eminent domain is perhaps the greatest power vested in the General Assembly, we will construe that power against the condemnor absent *specific* legislation to the contrary. OCGA § 32-2-2 (b) does not constitute such specific legislation. Furthermore, since neither the procedure for or the power of condemnation of public property is otherwise vested in the DOT, OCGA § 32-2-2 (b) does not, by itself, confer such power.

Finally, we note that this court has recently held that condemning authorities may not cynically play "Parcheesi" with condemnation procedures to accomplish ends that they might not accomplish without manipulation of those procedures. *Earth Management v. Heard County*, 248 Ga. 442, 446 (283 SE2d 455) (1981). The full body of the sentence of *Earth Management*, supra, cited in Justice Weltner's dissent reads, "We have repeatedly held that private property may not be taken for a private purpose *and that a condemning authority may not act in bad faith in the exercise of the right of eminent domain.*" Id. (Emphasis supplied to portion of sentence deleted from dissent.) In *Earth Management*, we prevented Heard County from condemn-

ing land for a public park when "there [was] evidence that even though the land [might be used as a park] after condemnation, the real reason for its being taken [was] to thwart the application of another use in which the state [had] an interest." Id. at 447. A full reading of *Earth Management*, thus, shows that "the necessary consequence of [this] holding" could only lead to "the absurd" if this court is willing and ready to ignore or abandon precedent.

DECIDED OCTOBER 8, 1985 —
RECONSIDERATION DENIED OCTOBER 29, 1985 AND NOVEMBER 5, 1985.

*Michael J. Bowers, Attorney General, Marion O. Gordon, First Assistant Attorney General, Roland F. Matson, William C. Joy, Senior Assistant Attorneys General, Charles M. Richards, Assistant Attorney General,* for Department of Transportation.

*Marva Jones Brooks, Kendric E. Smith, Overtis Hicks Coopwood,* for City of Atlanta et al.

*Walbert & Hermann, David F. Walbert,* for Davis et al.

*Neely & Player, Michael R. Johnson,* for Arapaho Construction Company, Inc.

*Hansell & Post, Terrence B. Adamson, Mary A. Prebula, Long & Aldridge, Jack H. Watson, Jr., Alston & Bird, Sidney O. Smith, Jr., Anne S. Rampacek, King & Spalding, Griffin B. Bell, Frank C. Jones, Richard A. Schneider,* amici curiae.